STATE EX REL. EAVES ET AL., RELATORS, *v.* RICKARDS ET AL. CONSTITUTING THE STATE FURNISH-ING BOARD OF THE STATE OF MONTANA, RESPONDENTS.

[Submitted May 2, 1895.   Decided May 6, 1895.]

STATE CONTRACTS—*Mandamus—Responsible bidder defined.*—The term "responsible" as used in the phrase "lowest responsible bidder" does not refer to pecuniary responsibility only, but includes judgment, skill, ability, capacity and integrity, and therefore, officers intrusted with the duty of awarding a contract to the lowest responsible bidder must exercise official discretion in determining the question and cannot be compelled by mandamus to award a contract to a particular bidder merely because he has offered the lowest bid and tendered a sufficient bond.

SAME—*State furnishing board—Discretion in awarding contracts.*—The rejection by the state furnishing board of a bid for the publication of the Montana Codes, although the lowest and accompanied by an offer of adequate security, was not a wrongful or arbitrary exercise of discretion where it appeared that the bidders discussed and explained their bids exhaustively to the board and their capacity to perform the work; that the board acted with deliberation and took adjournments to make further inquiries and, after considering all the facts and information which they could reasonably be expected to obtain, determined that the unsuccessful bidder had not the facilities to perform the work.

SAME—*Member of legislature—Interest in contract.*—Awarding a contract for state printing to a publishing company whose business manager was, at the time, a member of the state legislature, but who received a fixed salary for his services and had no interest in the profits of the company, does not violate § 30, Article 5, of the constitution, providing that no member of any department of the government shall in any way be interested in such contract.

MANDAMUS to compel state furnishing board to award a contract for printing codes to a particular bidder.   Dismissed.

Statement of the case by the justice delivering the opinion.

The matter before us is a decision upon the return of an alternative writ of mandamus.   The respondents, constituting the state furnishing board, let a contract to the Inter-Mountain Publishing Company for printing, annotating and binding the Codes which were adopted at the fourth session of the legislative assembly.

The act of the legislature, approved March 7, 1895, as to the printing of the Codes, provided, among other things:

"§ 4.   The said Codes, as compiled and codified by said

commissioner, shall be annotated by the publisher thereof as fully and completely as Hill's Annotated Statutes and Codes of the state of Washington, in so far as the reports of the supreme court of the state of California are contained, and shall contain full annotations of the Montana Reports to April 1, 1895. They shall be published in two royal octavo volumes, equal in size, quality of paper, press work and binding, and similar in respect to the type used, to said Hill's Codes.

" § 5. The state furnishing board of the state of Montana are required to immediately contract for the publication and annotation of said Codes, as specified in this act, contracting with the lowest responsible bidder therefor, which contract must not exceed the sum of eight thousand five hundred and fifty-five dollars for the publication and annotation of one thousand sets, containing two thousand three hundred pages, or less, and two and twenty-five one hundredth dollars for each additional page.

" § 6. The contract shall specify that one thousand sets shall be printed, published and delivered to the secretary of state, on or before the 30th day of June, 1895. That the type setting, printing and binding of said Codes shall all be done within the state of Montana. That the publisher shall keep on hand, and for sale, at price not to exceed ten dollars per set, a sufficient number of copies of said Codes to supply all demands for a period of not less than eight years. That the publisher shall also make and keep on hand a full and complete set of stereotype matrices of each and every page of type used in printing the Codes."

As to public printing, the constitution of the state provides as follows : "All stationery, printing, fuel and lights used in the legislative and other departments of government, shall be furnished, and the printing and binding and distribution of the laws, journals and department reports and other printing and binding, and the repairing and furnishing the halls and rooms used for the meeting of the legislative assembly, and its committees, shall be performed under contract, to be given to the

lowest responsible bidder, below such maximum price, and under such regulations as may be prescribed by law. No member or officer of any department of the government shall be in any way interested in such contract; and all such contracts shall be subject to the approval of the governor and state treasurer.'' (Article V., § 30.)

The application for the writ sets forth that on or about March 17, 1895, the state furnishing board caused to be published the following notice :

''Proposals for Printing.    Office State Furnishing Board, Helena, Montana.    March 13, 1895.

Notice is hereby given that the state furnishing board, in accordance with the provisions of an act entitled, ' An act to provide for the compilation, codification, publication, distribution and sale of the Code of Civil Procedure, Civil Code, Penal Code and the Political Code,' approved March 7, 1895, will receive proposals for the printing, binding, publication and annotation of the Political, Civil, Penal Code and the Code of Civil Procedure of the state of Montana, as codified by the code commissioners, in two royal octavo volumes, equal in size, quality of paper, presswork and binding, and similar in all respects to the type used, to Hill's Annotated Statutes and Codes of the state of Washington, as fully and completely as Hill's Codes are annotated, in so far as the reports of the supreme court of the state of California are contained, and, as well, full annotations of the Montana Reports to April 1, 1895. All bids must be filed with the secretary of this board on or before April 4, 1895, and be indorsed ' Proposals for Printing Codes of Montana.'    The Board reserve the right to reject any and all bids.

J. E. Rickards, L. Rotwitt, H. J. Haskell, State Furnishing board.''

The relators further state in their affidavit upon which they ask for the writ of *mandamus* that, in pursuance to said notice, they submitted to the board a bid for annotating, printing, and binding of said Codes, in the sum of $7,795, and $2.25 per page for each page exceeding 2,300, and that they

submitted another bid to annotate, print and bind, and deliver the required number of volumes for the sum of $8,290; that each of said bids was below the maximum provided by law to be paid for said service, and also lower than that of any other bid submitted; that they offered to execute a good and sufficient bond in the sum of $10,000, or in any other sum which the board might require. They allege, further, that they are experienced publishers, and responsible and capable artisans, engaged in devoting their services, skill, experience and ability to their business; that they are financially able to procure the services of competent and skillful codifiers and annotators to aid them, and are competent and responsible for the faithful execution of the work in a skillful and workmanlike manner. They set forth, further, that other proposals or bids were filed ; that the board examined the bids on April 4, 1895, and that the bid of the relators upon the first proposition submitted was $760 less than that of the Inter Mountain Publishing Company, and, upon the second proposition submitted, $265 less than the bid of said company. They further set out in their affidavit that the Inter Mountain Publishing Company is disqualified to contract for said work, because, as they are informed and believe, James H. Monteith is a member of said company as a stockholder and officer therein, and business manager thereof, actively and personally engaged in the management and promotion of the interests of said company, and as such is interested in the contract; and that the said James H. Monteith is now, and during all the times herein mentioned was, a member of the legislative department of the state, as representative from Silver Bow county, which legislature passed the act for said printing, binding and annotating the Codes. Relators further set up that by virtue of the facts stated it was the duty of the state furnishing board to award said contract to relators, and that they demanded that such action be taken by the board, but that, notwithstanding the facts set up, the board wrongfully, arbitrarily, and in disregard of the duty enjoined upon it, and contrary to the provisions of the constitution and laws, wrongfully resolved and pretended to award said contract to

the Inter Mountain Publishing Company.    Relators allege that they are beneficially interested by reason of their being bidders, as described, and being entitled to the award of said contract, and also by reason of their being citizens and taxpayers of the state.    They prayed a writ commanding the board to award said contract to them.

Upon this affidavit an alternative writ was issued, commanding the said board to convene and revoke the award of the contract to the Inter Mountain Publishing Company, and award the same to the relators, as the lowest responsible bidders, or to show cause on the 18th of April why they had not so done.

The respondents filed a demurrer, and a motion to quash. Decision was reserved upon the question raised by said motion and demurrer, and respondents were ordered to file their answer.    The answer being filed, there appeared to be a denial of most of the material allegations of the affidavit, and it seemed that there were raised questions of fact essential to the determination of the matter.    This court thereupon appointed a referee, and in the order appointing him defined the issues upon which he should take testimony.

The issues of fact, as set forth in the order of reference, were as follows:

"(1) Was James H. Monteith, mentioned in the affidavit in this case, a stockholder of the Inter Mountain Publishing Company at the time of the awarding of the contract herein mentioned to the Inter Mountain Publishing Company, or at any other time mentioned in said affidavit?

"(2) Is the said James H. Monteith interested, or was he at the time of the letting of the contract interested, in any manner whatever, in the contract awarded as aforesaid to the said Inter Mountain Publishing Company?    If so, how, and to what extent?

"(3) Did the relators, in making their alleged bid, offer to execute or deliver to said board a good and sufficient bond or undertaking, or any bond or undertaking, for the sum men-

tioned in the affidavit, or any sum, for the performance of the contract?

"(4) Did the state furnishing board, in awarding the contract in question, make inquiry as to whether the relators were financially able to procure the services of competent and skillful codifiers and annotators; and, if so, what inquiry did they make?

"(5) Did said board, in letting the said contract, make inquiry as to whether relators were competent or responsible for the performance of the contract in a skillful and workmanlike manner, according to the requirements of law; and, if so, what inquiry was made?

"(6) Did the board, in awarding the said contract, make inquiry as to whether the relators were able to annotate the said Codes as fully and completely as Hill's Annotated Statutes and Codes of Washington are annotated, in so far as the reports of the state of California are contained; and, if so, what inquiry was made?

"(7) Did the said board, in awarding the said contract, make inquiry as to whether relators were capable, and could do or cause to be done the typesetting, printing, and binding of the said Codes within the State of Montana, or could have published the same as required by law; and, if so, what inquiry was made?

"(8) Did the state furnishing board, before awarding said contract, meet for the purpose of considering bids submitted to them, and what examination did they make of said bids? Did they hear relators, and other persons who had presented bids? What inquiry did they make as to the ability and qualification of said bidders to perform the said work? · What inquiry did they make as to the responsibility of the several bidders, financially and otherwise? Was the determination of the said board to award the contract to the Inter Mountain Publishing Company based upon the facts inquired into by them?"

The referee has filed a voluminous report. Counsel argued the law of the case fully upon the motion to quash and the de-

murrer, and have also discussed the questions of law and fact since the filing of the referee's report.

*Wilbur F. Sanders* and *E. N. Harwood*, for Relators.

*Henri J. Haskell*, *Wm. Scallon* and *E. S. Booth*, for Respondent.

DE WITT, J.—As we have viewed the case from its inception, there seem to be only two main propositions for the decision of this court: (1) Had the state furnishing board, in awarding this contract, discretionary powers? This is the question of law in the case. (2) If the first proposition be answered in the affirmative, did the board wisely exercise such discretion, or did they, as alleged by the relators, exercise it "wrongfully, arbitrarily, and in disregard of duty"?

We will first address our attention to the question of law. It is true that the relators were the lowest bidders for this contract, and it is probably true that they offered to give a bond for the faithful execution of the same if it were awarded to them, and they allege that they were competent and skillful for the performance of the service. But does this conclude the state furnishing board? Is the offer of the lowest bid and the tendering of a bond sufficient to constitute one the lowest responsible bidder? The authorities do not so hold. The board must let the contract to the lowest responsible bidder. Responsibility includes judgment, skill, ability, capacity, and integrity, and it is the duty of the furnishing board to wisely and honestly determine this question of responsibility.

It is said in Merrill on Mandamus (section 117): "The law generally requires public officers who are charged with letting contracts for public work to accept the lowest bid therefor and to make the contract accordingly. When such bidder has fully complied on his part with the requirements·of the law, he may by the writ of *mandamus* compel the officer to make the contract with him. The writ has been considered appropriate in relation to a contract for constructing county buildings (*Boren* v. *Commissioners*, 21 Ohio St. 311; *State* v. *Board of Com'rs*

*of Licking Co.*, 26 Ohio St. 531); for state printing (*State* v. *Barnes*, 35 Ohio St. 136; *State* v. *Printing Com'rs*, 18 Ohio St. 386; *American Clock Co.* v. *Com'rs of Licking Co.*, 31 Ohio St. 415); for articles to be purchased for use of the county for building a bridge (*People* v. *Buffalo Co.*, 4 Neb. 150); for repairing the Erie Canal (*People* v. *Contracting Board*, 46 Barb. 254). When the officer is allowed a discretion in the matter, the writ will be refused. (*People* v. *Board*, 27 N. Y. 378.) It has been refused because the officer could decline the bids if he deemed them to be excessive or disadvantageous to the state (*People* v. *Board*, 33 N. Y. 382); because the officer was only required to let the contract to the lowest bidder if he was responsible (*Hoole* v. *Kinkead*, 16 Nev. 217), or if he furnished adequate security (*People* v. *Fay*, 3 Lans. 398); because the contract was to be let to the lowest responsible bidder, and the contract in the case required, for its fulfillment, pecuniary ability, judgment, and skill (*Commonwealth* v. *Mitchell*, 82 Pa. St. 343); and because in the advertisement the right to reject any and all bids was reserved (*Hanlin* v. *Independent Dist.*, 66 Iowa, 69, 23 N. W. 268)."

We quote, also, from the following authorities:

It is held in *Douglass* v. *Commonwealth*, 108 Pa. St. 559, as follows: "In the act of assembly approved May 23, 1874, (P. L. 233), directing contracts for supplies to be awarded to the lowest responsible bidder, the word ' responsible' does not refer to pecuniary ability only. The act calls for an exercise of discretionary powers on the part of the city officers; and if they act in good faith, although erroneously or indiscreetly, *mandamus* will not lie to compel them to change their decision. They may be ordered by *mandamus* to proceed to do their duty of deciding and acting according to their best judgment, but the court will not direct them in what manner to decide. See, also, *Commonwealth* v. *Mitchell*, 82 Pa. St. 343, as follows: "The word ' responsible' in the 6th section of the act of 23d of May, 1874, has a broader meaning than is involved in the

pecuniary ability to make a good contract by security for its faithful performance, and where the term is applied to contracts requiring for their execution, not only pecuniary ability, but also judgment and skill, the statute imposes, not merely a ministerial duty upon the city authorities, but also duties and powers which are deliberative and discretionary; and therefore, where these authorities have exercised a discretion, *mandamus* will not lie to compel them to modify their decision, even though their action was erroneous, in the absence of clear proof of fraud or bad faith.''

·It is said in *Kelly* v. *City of Chicago*, 62 Ill. 282, as follows : ''The complainants have merely submitted a proposal to make a certain contract with the board. How do they found upon that a right to have the board make the contract with them ? The notice for proposals expressly reserved the right to reject any bid. The charter did not make it the absolute duty of the board to let the contract to the lowest bidder. It provides that ʻall contracts shall be awarded by said board to the lowest reliable and responsible bidder.ʼ These qualities of being reliable and responsible, it is obvious, were of the utmost importance in the construction of a work of this magnitude. And the complainants must have been the possessors of these requisites, as well as being the lowest bidders, to make a case of duty on the part of the board to award the contract to them. It was for the board to determine whether the complainants were reliable and responsible. It exercised its judgment upon the question, and found they were not so, and for that reason awarded the contract to another bidder.''

See, also, the following from *Hoole* v. *Kinkead*, 16 Nev. 220 : ''§ 5 of the statute referred to provides that ʻsaid board may adopt or reject any and all bids not deemed reasonable or satisfactory, but in determining bids for the same work or material, the lowest responsible bid shall be taken.ʼ (Laws 1881, page 59.) The provision that they shall take the lowest responsible bid is mandatory, and they had no power or authority to accept any other; but in ascertaining whether or not

a bidder was responsible they were required to deliberate and decide, and in doing so they exercised judicial, not ministerial, functions. And, in deciding upon the responsibility of bidders, it was their duty to consider, not only their pecuniary ability to perform the contract, but it was their right and duty to inquire and ascertain which ones, in point of skill, ability and integrity, would be most likely to do faithful, conscientious work, and fulfill the contract promptly, according to its letter and spirit. In *Commissioners* v. *Mitchell*, 82 Pa. St. 349, a case similar to this, and under a statute requiring a contract for stationery, etc., to be given to the 'lowest responsible bidder,' the court thus forcibly expresses itself : 'It is scarcely open to doubt but that the word under consideration ("responsible"), as used in the statute, means something more than pecuniary ability. In a contract such as the one in controversy the work must be promptly, faithfully and well done. It must, or ought to be, conscientious work. To do such work requires prompt, skillful and faithful men. A dishonest contractor may impose work upon the city, in spite of the utmost caution of the superintending engineer, apparently good, and even capable of bearing its duty for a time, which in the end may prove to be a total failure, and worse than useless. Granted, that from such a contractor pecuniary damages may be recovered by an action at law. That is, at best, but a last resort, that often produces more vexation than profit,—a mere patch upon a bad job; an exceedingly meager compensation, at best, for the delay and incalculable damage resulting to a great city from the want of a competent supply of water. The city requires honest work, not lawsuits. Were we to accept the interpretation insisted upon by the relators, the difference of a single dollar in a bid for the most important contract might determine the question in favor of some unskillful rogue, as against an upright and skillful mechanic. Again, we know that, as a rule, cheap work and cheap workmen are but convertible terms for poor work and poor workmen, and if the city, for the mere sake of cheapness, must put up with these, it is indeed in a most unfortunate position.' "

We take the following from the syllabus of *People* v. *Dor-sheimer*, 55 How. Pr. 118: "It is provided by chapter 634 of Laws of 1875 (pages 809, 810) that all contracts for work to be done upon the new capitol shall be awarded to the lowest *bona fide* responsible bidder or bidders. *Held*, that the statute requires the successful bidder to be a responsible one,—that is, 'able to respond or to answer in accordance with what is expected or demanded,'—in addition to the giving of the bond for the faithful performance of the contract. He is not to be deemed a responsible bidder because he offers adequate security for the performance of the contract. Where the contracting board has passed upon the pecuniary responsibility of a bidder, and rejected his bid because their conclusion was unfavorable to him in that particular, the court will not interfere, so long as there has been no abuse of discretion."

See, also, remarks of the supreme court of Massachusetts in the case of *Mayo* v. *Commissioners*, 141 Mass. 74, 6 N. E. 757: "We need not consider whether a private person can maintain a petition for a writ of mandamus to compel public officers to perform their duties, or to direct the manner in which they shall perform them. It is enough for the decision of this case that there has been on the part of the respondents no neglect to perform their duty, and no error in the manner in which they have performed it. County commissioners are not required by law to accept the lowest proposal for public works. The statute provides that all contracts for public works made by them shall, if exceeding $300 in amount, be made in writing, after notice for proposals therefor has been published at least three times in some newspaper published in the county, city or town interested in the work. Pub. St. c. 22, § 22. It does not provide that they shall accept the lowest proposal. It is clearly the intention of the legislature that the county commissioners, after inviting competition by public notice, shall have the authority to make such contract as in their judgment the interests of the county require. In the case at bar the commissioners fully complied with the statute. If, upon examining the various proposals, they were satisfied

that Mayo, the lowest bidder, was an irresponsible person, unfit and incompetent to perform the work proposed, it was their right and duty to reject his proposal, and to make a contract with some other person, such as, in their judgment, was the most advantageous to the county."

Mr. High, in his work on Extraordinary Legal Remedies, after reviewing the Ohio decisions, says : "The better doctrine, however, as to all cases of this nature, and one which has the support of an almost uniform current of authority, is that the duties of officers intrusted with the letting of contracts for works of public improvement to the lowest bidder are not duties of a strictly ministerial nature, but involve the exercise of such a degree of official discretion as to place them beyond control of the courts by mandamus. And the true theory of all statutes requiring the letting of such contracts to the lowest bidder is that they are designed for the benefit and protection of the public, rather than for that of the bidders, and that they confer no absolute right upon a bidder to enforce the letting of the contract by mandamus after it has already been awarded to another. In all such cases the spirit, rather than the strict letter, of the law requiring the work to be let to the lowest bidder, should be kept in view. And where the right of the officers to enter into the contract is itself somewhat doubtful mandamus will not lie. Nor does the mere issuing of proposals, by officers intrusted with letting contracts, inviting bids for the performance of the work, without binding themselves to award the contract to the lowest bidder, create such an obligation on the part of the officers as to entitle the lowest bidder to the aid of a mandamus to obtain the contract. See, also, *State* v. *McGrath*, 91 Mo. 386, 3 S. W. 846; *Findley* v. *City of Pittsburg*, 82 Pa. St. 351; *Madison* v. *Board*, 76 Md. 395, 25 Atl. 337; *State* v. *Scott*, 17 Neb. 686, 24 N. W. 337; *People* v. *Contracting Board*, 33 N. Y. 382; High on Extraordinary Legal Remedies, § 48; and also the exhaustive note upon the whole subject found in *Anderson* v. *Board*, 26 L. R. A. 707.

We quote these authorities simply as to the law as it is ap-

plicable to the case at bar.    There are some propositions dis-
cussed and decided in them which are not now before us, and
upon which we do not express an opinion.    We are wholly sat-
isfied, from the authorities, that the state furnishing board in this
case had discretionary power.    It is the intention of the law
that the board shall determine who is the lowest responsible
bidder.

Before leaving the law of the case, we observe that it is
held by many authorities that bidders other than those to
whom the contract is awarded, such as relators here, have no
standing in court to compel by *mandamus* the letting of the
contract to them.    See part of the cases above cited, and 26
L. R. A. 707, and cases.

It has also been urgently argued that the affidavit and writ
in this case are insufficient, but these, and some other points
raised in this case, we prefer to pass, and reserve an opinion
thereupon, and to decide the case upon the merits of the facts
as returned by the referee.    It is a grave and serious matter
if a state board, instead of fairly and honestly awarding a
contract, act "wrongfully, arbitrarily, and in disregard of
their duty," as charged in relators' affidavit, or act through
favoritism and for the purpose of usurping state patronage for
personal ends, as argued by relators' counsel.    If such a
wrongful course is taken by a state board, it appears that there
is some method of reviewing it by a court.    How such action
by a board shall be reached by the court is not necessary to
determine.    The gravity of the charges against the board in
this case has led us to pass all preliminary questions in the
case, and to enter upon the merits of the facts.

Having determined the question of law, which we noted
above as the first matter for consideration, we will now exam-
ine the facts and endeavor to ascertain whether the board acted
"wrongfully, arbitrarily, and in disregard of duty," or
whether they fairly and honestly exercised the discretion vested
in them.

In a case which was relied upon by the relators it is said:

" The learned counsel of appellant has directed most of his argument to this question. The argument against the writ is, in substance, that the statute requires the auditor to examine the proceedings, and satisfy himself that they are legal, before signing; and that if he has examined them, and become satisfied that they are not legal, the most that can be said is that he has committed an error in a matter confided to his discretion, and that the function of the writ is not to review such exercise of discretion. It must be acknowledged that this argument is exceedingly plausible. There are innumerable cases in which it is laid down that *mandamus* cannot issue to control discretion.

The rule, which is undoubtedly correct when properly understood, has been expressed in various forms. It has been repeatedly said that the writ cannot perform the functions of a writ of error; that it cannot issue to revise judicial action, but can only compel the performance of ministerial functions; and that it will issue to compel a tribunal to act in some way, but not in any particular way. These formulas undoubtedly express a truth, but they express it in an inaccurate and misleading manner; and, by reasoning from them as if literally and in all cases true, courts have sometimes been led into error, and have frequently been forced to call acts ' ministerial ' which are plainly not so. An examination of the authorities will demonstrate the inaccuracy of the above phrases. Thus it is not accurate to say that the writ will not issue to control discretion; for it is well settled that it may issue to correct an abuse of discretion, if the case is otherwise proper. (*Ex parte Bradley*, 7 Wall. 377; *State* v. *Lafayette Co. Court*, 41 Mo. 226; *Council of Village of Glencoe* v. *People*, 78 Ill. 389; *People* v. *Superior Court*, 10 Wend. 285; *Stockton Railroad Co.* v. *Stockton*, 51 Cal. 339; Tapp. Mand. 14." Quoted from *Wood* v. *Strother*, 76 Cal. 545, 9 Am. Dec. 252.

Therefore, let us inquire whether there is a showing in this case of an abuse of discretion by the state furnishing board. After the advertisement for bids, the board met to examine the same; present, a full board. The meeting was commenced

April 4th, and continued to April 5th. All the bids were opened by the board in the presence of the bidders. The bidders then discussed and explained their bids, and their capacity to perform the work. In the order of reference the referee was directed to ascertain what inquiry the board made upon the various points set out in the order of reference. The examination of the witnesses by the relators sought to develop as a fact that the board did not themselves ask questions of the different bidders, and therefore did not make inquiry. But the testimony is that the bidders talked and explained exhaustively. It is a matter of no consequence whether the board obtained their information and facts by asking questions themselves, or whether the information came voluntarily from the persons who possessed the same. In fact, one witness says that at one time the bidders all talked at once, and that the board had nothing to do but to listen.

Mr. Ross, one of the relators, testified that he and his partner, Mr. Eaves, and Mr. Bond and Mr. Monteith, two other bidders, and others, were accorded a full hearing before the board, touching the merits of the several bids submitted, as well as the conditions under which the law required the Codes to be printed.

The governor, president of the board, testified that Mr. Eaves, one of the relators, admitted that he had not as good a plant as some of the bidders, but always fell back on the argument that he could give a bond, which in itself should be a sufficient guarantee of their ability. The governor says that he had information that the relators were not a well-equipped firm, or capable of doing the work. He says he learned that it was a mechanical impossibility for one publishing house to get out the Codes by the 1st of July. He says that Mr. Monteith stated to the board that with the full equipment of the Inter Mountain Publishing Company it would be a mechanical impossibility for their house to get the Codes out without assistance from some other printing house, and that they had entered into an arrangement with a capable printing establish-

ment, and that with their help it would take all the time given by law to do the work.   The governor says that he was satisfied by general information that the business and financial ability of the relators were not such as would guarantee the completion of the work.   The governor says that he had no commercial reports as to the relators, but he said, "You know, we get our impression of these things as we get our impression of business men and firms generally." He says that the question of the financial responsibility of the relators was frequently expressed in his office while the matter was pending. He says his information was that the relators were one of the smallest printing firms in the state, and that he looked at that as he looked at any business proposition.   He states that Mr. Eaves said that his firm could bind books, but they had no thorough bindery.

The attorney general says that Mr. Monteith, of the Inter Mountain Publishing Company, and Mr. Eaves, of the relators, and Mr. Bond, of the Standard Publishing Company, made explanation of their bids, that the board listened, and that questions were propounded, and that the board had a full hearing.   The board then adjourned until the next day, for the purpose of inquiring into the ability of the parties to perform the work. They then had before them Judge Wade, and questioned him as to making the annotations.   The board heard all the bidders discuss their ability to perform the work, and the conversation was only about the merits of the different bidders. The board paid great attention to the question of the time in which the work could be gotten out, it being required by law that it should be completed by July 1st.   The attorney general says the board considered two propositions:   First, which of the bidders had the ability to perform the contract; and, second, as to the annotations to be used,—and that the bidders furnished the information and the evidence.   Mr. Eaves himself says that Mr. Monteith fully explained his bid, and stated that the attorneys of the state desired the Deering annotations, which annotations the Inter Mountain Publishing Com-

pany proposed to give, while the relators proposed to give annotations by Judge Wade and others.

Mr. Monteith, manager of the Inter Mountain Publishing Company, as a witness, testified before the referee that he had explained his bid, and how it was specific and unequivocal, while the others were ambiguous.    He stated that he represented one of the largest printing establishments in the state, and that it would· crowd them to complete the work if they entered upon it at once.    Mr. Monteith says that the governor, as chairman of the board, stated that the board desired all the information they could get, and that they were arriving at this information through the course of the conversation which they were having at that time.    Mr. Monteith said that at the two meetings of the board the chairman stated that they were there for the purpose of hearing the bidders in relation to their bids. Mr. Monteith stated to the board that he had inquired as to the ability of Ross, Frank, and Eaves to perform the labor; that he was informed by printers of Helena that they were incompetent to perform the contract if awarded to them; that they had no stereotype plant; that they had no bindery, and that the capacity of their press was such that it was inadequate for performing the services; that their financial standing was such that supplies were sent to them with the bill of lading attached to the draft, c. o. d. In the the presence of the board Mr. Bond asked Mr. Eaves if they had a stereotype plant.    Mr. Eaves admitted that they had none.    Mr. Bond asked him if they had a bindery.    Mr. Eaves admitted that they had none.    Mr. Eaves admitted that they had not yet made arrangements for a stereotype plant, but they had made arrangements for binding.    Mr. Bond testified that Mr. Eaves was heard by the board, and set forth the merits of his bid and his capacity.

We do not propose to recite this testimony any further.    It covers 263 typewritten pages, as reported by the referee. The most searching examination was made by able counsel into the acts of the board.    While we do not pass upon the competency

or incompetency of all the testimony introduced before the referee, we are perfectly satisfied that it appears that the state furnishing board made a diligent and careful inquiry into the skill, competency and ability of both the Inter Mountain Publishing Company and the relators herein.    It appears that they considered all the facts and information which they could reasonably be expected to obtain, and that they acted wisely and discreetly, and not arbitrarily and wrongfully, upon the information before them.    To say that the board acted wrongfully and arbitrarily and in disregard of duty is wholly unsustained by the evidence.    It is to be observed that there was a difference of only $265 upon a contract of some $8,000.    With this slight difference in figures, and this thorough showing of fair dealing by the board, it would be a remarkable precedent for a court to hold that the action of the board should be disturbed by *mandamus.*    It is to be observed, further, that the board did not act hastily.    After a sitting of an hour and a half at the first session, the board adjourned without taking action, for the purpose of making further inquiries, and upon reassembling they gave everybody an ample opportunity to be heard.

There is one other matter left for consideration.    The relators alleged that the Inter Mountain Publishing Company is disqualified to receive the award of this contract, because Mr. Monteith was a member of the legislative assembly at all times mentioned in the affidavit, and, as relators are informed and believe, is a member of said publishing company, as a stockholder and officer therein, and business manager thereof, actively engaged in the management and promotion of the interests of said company, and as such is interested in the contract.

On the argument made upon the return of the referee's report, relators do not point out to us one syllable of testimony offered by them showing or tending to show that Mr. Monteith held a single share of stock in the Inter Mountain Publishing Company, or that he had one dollar's worth of interest in that concern.    Nor have we found such testimony in the report.    Upon the contrary, Mr. Monteith testified that he had no interest in the contract, or the proceeds or profits thereof,

and that he had not even a contingent interest in the profits of the publishing company; that he is paid a fixed salary, and always has been; that the obtaining of the contract would not affect his salary in any way whatever; that he has no interest in the Inter Mountain Publishing Company, and did not, at any of the times mentioned, own any of its stock. The only showing of Mr. Monteith's connection with the publishing company is that which was admitted by the pleadings, to wit, that he was and is business manager. But it clearly appears that the obtaining or the losing of this contract would not affect his position as manager, or his salary, in any way whatever.

We have given this case a more lengthy consideration than we at first intended, or perhaps the case deserves. But we have done this by reason of the public character of the acts of the state furnishing board, and by reason of the fact that fairness and honesty must be demanded in the acts of such board; and we believe it a wholesome precedent to inquire closely into the conduct of the board. We have heard the case twice argued, once upon the law and once upon the facts, and we have appointed an able and competent referee to make diligent investigation into the facts. The matter of printing and annotating the Codes is a great public enterprise, which should be proceeded with at once, but should not be proceeded with at all, if, as has been intimated, there was fraud, collusion and arbitrary action by the board. When the time comes that a showing is made of such conduct by the officers of any state institution, and the matter is brought to the attention of this court in a procedure by which it can be reviewed, it will receive a prompt judgment of condemnation.

The writ of *mandamus* is dismissed.

PEMBERTON, C. J. and HUNT, J., concur.