STATE EX REL. STATE PUBLISHING CO., RELATOR, *v.* SMITH, GOVERNOR, ET AL., RESPONDENTS.

[No. 1,394.]

[Submitted May 10, 1899. Decided June 12, 1899.]

*Mandamus—Jurisdiction—State Officers—Approval of Public-Printing Contract.*

1. Constitution, Article IV, Section 1, prohibiting any one department of the state government from exercising any of the powers belonging to the other, does not prevent the courts from controlling by mandamus the exercise by the state executive of a purely ministerial duty.

2. Constitution, Article V, Section 30, provides that the state printing shall be done under contract, to be given to the lowest responsible bidder, under such regulations as may be prescribed by law, and that all such contracts shall be subject to the approval of the governor and state treasurer. Political Code, Sections 704-714, provides for the letting of the contract by a State Board of Examiners, of which the governor is made a member; Section 710 providing that all contracts made by the board must be approved by the governor and state treasurer. *Held*, that the duty of such officers to approve a contract let by the board is not ministerial, but involves judicial discretion, and cannot be controlled by mandamus.

APPLICATION by the state, on the relation of the State Publishing Company, against Robert B. Smith, governor, and Timothy E. Collins, treasurer, for *mandamus* to compel them to approve a contract for the state printing claimed to have been awarded to relator by the State Board of Examiners. Dismissed.

## STATEMENT OF THE CASE.

This is an application by the State Publishing Company for a writ of mandate to require Robert B. Smith and Timothy E. Collins, as governor and treasurer, respectively, of the State of Montana, to approve a contract for the printing, binding, and distribution of the laws, journals, department reports, and other documents for the State of Montana, which it claims was accorded to it by the State Board of Examiners.

The affidavit alleges that on the 28th day of November, 1898, the State Board of Examiners advertised for more than twenty days, in two daily papers published at the seat of government, for proposals for furnishing and doing all printing and binding and distributing of the laws, journals, reports, and other printing and binding of all books used by any state department or officers, and did invite proposals therefor to be delivered to it on or before 12 o'clock noon of December 20, 1898, and further required each bid to be accompanied by a bond, as prescribed by law; that on December 20, 1898, upon the opening of said bids by the board of examiners, the said board found, and so declared, that the bid of the State Publishing Company was the lowest responsible and best bid for the said work; that the said board did thereupon award to it the contract for doing the said work, by means whereof then and there a contract was made between the State Publishing Company and the State of Montana for the doing of said work, upon the terms and conditions in said advertisement and bid set forth and declared; that the said Robert B. Smith and Timothy E. Collins were at that time, and ever since have been, respectively, the governor and treasurer of the State of Montana, and it then and there became and was the ministerial duty of them, and each of them, to approve the said contract; that although the bid of the relator was $1,000 less than any other, and the said contract was further reduced to writing, and was, with the bond filed by the State Publishing Company, in fact, and in the judgment of the board of examiners, valid and correct, in substance and form, and although both

the bond and contract were held to be in compliance with the requirements of Section 708 of the Political Code [of Montana, yet the said Robert B. Smith, as governor, and Timothy E. Collins, as treasurer, well knowing that said contract ought to be approved by them, did assume to, and did, in form, disapprove of the same; that they did this with the intent and for the purpose that the contract might be let, and the work done, by a person or corporation not in truth and fact the lowest responsible bidder; that they did not disapprove of the contract because of any defect of form in it or the bond; nor because the said board had not decided that the bid of the State Publishing Company was the lowest responsible bid, nor because the contract had not been awarded to the State Publishing Company, but that their action in withholding their approval was arbitrary, without any reason had or given, and for causes beyond their jurisdiction and authority, which was confined to an inquiry as to the form of the contract, and whether it had been let by the board of examiners in conformity with the law; that meanwhile the said Robert B. Smith, as governor, had ordered the State Publishing Company to do divers and sundry of said printing under said contract, and that the said company, at his request and the request of the board of examiners, had proceeded to do a large amount of said printing, and was proceeding to carry out the contract; that thereafter, and while the said company was engaged in carrying out the contract, the said Robert B. Smith and Timothy E. Collins proceeded to examine the same and, without having or giving any reason, disapproved of the same as aforesaid; that Thomas S. Hogan, secretary of the State of Montana, has caused to be prepared copies of all laws and resolutions, with marginal notes, passed by the Sixth legislative assembly, and also copies of the journals kept, passed, and adopted at such session, with proper indexes of the same, as kept for the public printer, but that he will not deliver to the State Publishing Company or its agent the copies of the laws and resolutions, with proper indexes to the same; that on March 21, 1899, at the office of the Secretary

of State, and during business hours, the State Publishing Company,. by its agent, demanded of the said secretary that he deliver to it the said copies, to the end that they might be printed under said contract, but that said secretary refused to so deliver them.

The affidavit further alleges that, for the reasons stated, the State Publishing Company cannot proceed under its contract with profit to itself, as it might otherwise do; that it is entitled to have the contract approved, and was entitled to have it approved, on and before March 21, 1899, because such approval is specially enjoined upon the said governor and treasurer; and that it has no plain, speedy, and adequate remedy, in the ordinary course of law.

Wherefore the writ is demanded, to the end that the said governor and treasurer be required to approve the contract, or to show cause why he should not.

An alternative writ was issued, directed to the respondents, and requiring them to approve the contract as demanded, or to show cause before this court, on the 9th day of May, 1899, why they had not done so.

The respondents moved to quash upon the following grounds:

(1)   That this court has no jurisdiction to issue said writ.

(2)   That the facts stated are not sufficient to constitute a cause of action, or to authorize the issuance of the writ, or to afford any relief to the relator in this proceeding.

*Messrs. Sanders & Sanders,* for Relator.

*Messrs. Carpenter & Carpenter,* for Respondents.

MR. CHIEF JUSTICE BRANTLY, after stating the case, delivered the opinion of the court.

The contract referred to in the affidavit was before this court for consideration in *State ex rel. State Publishing Co.* v. *Hogan,* 22 Mont. 384, 56 Pac. 818, decided on March 31st of this year.   It was there held, under Section

30, Article V, of the Constitution, that it is indispensable to the validity of such a contract that it be approved by the governor and state treasurer. The contention is now made by the relator that the duty of approval on the part of the governor and treasurer is purely a ministerial one, and we are asked to enforce the performance of it by *mandamus.* On the other hand, counsel for respondents deny the jurisdiction of this court to exercise any control, through the medium of this writ, or in any other manner, over the executive department of the state government; claiming that it is, under the constitution, an independent, co-ordinate branch of the government, with the functions of which we are forbidden by the constitution to interfere. Our attention is called to the provision of our constitution distributing the powers of the state government into the three distinct departments, and expressly prohibiting any one of them from exercising any of the powers belonging to the other. (Const. Art. IV, Sec. 1.) Similar provisions are found expressed in the constitutions of all the states. The provision is not expressed in the constitution of the United States, but it is held that the various departments of the federal government are as separate and distinct, and as independent of each other in their operations, as are those of the state governments. (*Marbury* v. *Madison*, 1 Cranch, 137; *Mississippi* v. *Johnson*, 4 Wall. 475.)

The extent of the jurisdiction of the courts over the executive department of the government by *mandamus* has often been considered. By many courts it is denied altogether. Such courts hold that the executive is responsible, under his official oath, to the people only, and must be left to his own judgment and conscience as to how he shall discharge the duties of his trust. In other jurisdictions it is held that while he cannot be controlled in any way by the process of the courts in the discharge of those duties which are political and executive, involving the exercise of judgment and discretion, yet in the exercise of those powers and duties which are purely ministerial, and which might just as well have been enjoined by law upon some other person, he is as much sub-

ject to the control of the courts as any other officer. There is a great deal of learning in the books on this subject. The following authorities, with the references contained in them, fairly present the opposite views: High on Extra. Leg. Rem. Sec. 118 *et seq;* Merrill on Mandamus, Secs. 91–97; Wood on Mandamus (3rd Ed.) pp. 86, 87; *Sutherland* v. *The Governor*, 29 Mich. 320; *People ex rel. Broderick* v. *Morton*, 156 N. Y. 136, 50 N. E. 791; *State ex rel. Robb* v. *Stone*, 120 Mo. 428, 25 S. W. 376; *Hovey* v. *State ex rel. Schuck*, 127 Ind. 588, 27 N. E. 175.) It is not necessary in this case, however, for us to examine these authorities with the purpose of announcing a rule for this jurisdiction. In the case of *Chumasero* v. *Potts*, 2 Mont. 242, decided by our territorial supreme court in 1875, it was held that the governor could be compelled by *mandamus* to perform a ministerial act, as where it was made his duty, by statute, to sit as a member of a canvassing board to canvass the vote of the people upon the question of whether the territorial capital should be moved, and he refused to perform the duty. This case was followed by the subsequent case of *Territory ex rel. Tanner* v. *Potts*, 3 Mont. 364, decided in 1879, where it was held that *mandamus* was the proper remedy to compel the governor to audit and allow a claim of the relator for expenses incurred and for compensation while acting as a messenger, under the appointment of the governor, to bring a fugitive from justice, under a warrant of extradition from the state of Ohio to the territory of Montana. Again, this court, in *State ex rel. Eaves* v. *Rickards*, 16 Mont. 145, 40 Pac. 210, entertained jurisdiction upon an application for a writ of *mandamus* to compel the State Board of Examiners, *ex officio* also the State Furnishing board, of which the governor was a member, to let the state printing contract to the lowest responsible bidder. Though the writ was denied in this case, yet the application was tried on its merits. It seems that no question of jurisdiction was made, but this court proceeded upon the assumption that it had jurisdiction to try and determine the question presented, though the governor was a member of the board. We shall,

therefore, assume here that the state executive, when acting in a ministerial capacity only, and in matters not involving executive judgment and discretion, may be controlled by this writ.

The constitution (Art. V, Sec. 30) provides that "the printing, and binding, and distribution of the laws, journals, and department reports and other printing and binding  *  *  * shall be performed under contract, to be given to the lowest responsible bidder,  *  *  * under such regulations as may be prescribed by law;  *  *  * and all such contracts shall be subject to the approval of the governor and state treasurer."

The regulations prescribed by law for the letting of the contract are found in the Political Code, Sections 704–714, inclusive. Sections 710 provides: "All contracts made by the board must be approved by the governor and the state treasurer."

The relator contends that the provision of the constitution, *supra*, requiring approval by the governor and treasurer, and of the statute passed in pursuance of the constitution, imposes a merely ministerial duty upon these officers, and that their refusal to approve the contract is capricious and arbitrary, and therefore subject to review by this court. The use of the word "must" in the statute is construed by counsel for relator to mean that the obligation merely to approve rests upon them, and that they may not refuse to do so after the board has declared that a certain bid is the lowest responsible bid, and let the contract to the bidder making it. It may be unfortunate that the governor was made a member of this board whose duty it is to let these contracts. It puts him in a position where he can refuse to approve the action of a majority of the board of which he is a member, and thus put his veto upon proceedings in which he takes part. Nevertheless his duty as a member of this board in relation to these contracts is statutory, while his duty in approving or disapproving the action of the board is constitutional, and we are of the opinion that, under the provision of the constitution, it

was designed that he and the treasurer should do more than approve in a ministerial way the action of the board in letting the contract. The expression, "shall be subject to the approval," implies that there may be a disapproval. The word "approve" means "to pronounce good; think or judge well of; admit the propriety or excellence of; be pleased with; commend." (Cent. Dict. tit. "Approve.") The constitution does not define the extent to which they must go in the investigation of the action of the board, nor does it require that they must act together or state any reason for their actions. Yet from the very fact that their approval is indispensable, under the constitution, the conclusion is irresistible that their action is designed to be a check upon the action of the board. This is the implication from the terms used and the rule of construction that every word of the instrument should be rendered operative. *State ex rel. Publishing Co.* v. *Hogan, supra.* If this be true, in the discharge of their duty they must use their judgment and discretion as to all matters into which the board could or should inquire. This includes not only the pecuniary responsibility of the bidder, but his judgment, skill, ability, capacity and integrity as well. (*State ex rel. Eaves* v. *Rickards, supra.*) The governor having a general knowledge of the affairs of the state, and presumptively being fitted by his superior qualifications to pass judgment upon the action of the board, it was thought proper by the constitutional convention that he should give the taxpayers the benefit of his judgment and discretion. The treasurer being in a position in which he is presumed to be especially informed as to the condition of the state's finances, it was thought proper to require the exercise of his judgment and discretion also. The ultimate purpose was, by this system of counterchecks, to secure economy and prevent favoritism. It is not for us to say whether the provision is a wise one or not. These officers, acting within the sphere of their constitutional duties, are accountable, under their oaths, to the people only, just as are the individual members of this court, and it is no part of our duties to inquire into their motives in

withholding their approval from the contract let by the board to the relator. If they have acted arbitrarily, if they have chosen to pervert the functions of their high offices to vile, partisan uses, or to the purposes of favoritism, as is suggested by the allegations in the affidavit, we have no power to restore their consciences, and bring them to a sense of their duty. The forum in which they are to be judged is the minds and consciences of the people, whose servants they are, and who alone can hold them responsible for the manner in which they perform their duties.

It boots nothing that the board has let the contract to some other person, as counsel for respondents say. If such be the case, we have nothing to do with such action here. It may have been lawfully or unlawfully done. However this may be, the fact cannot be allowed to influence the judgment of the court in this case.

We are of the opinion that the motion to quash the writ *nisi* is well made. Motion to quash sustained, and the application dismissed.