KOICH, APPELLANT, v. CVAR ET AL., RESPONDENTS.

(No. 8,180.)

(Submitted February 10, 1941. Decided February 28, 1941.)

[110 Pac. (2d) 964.]

Cause submitted on briefs of counsel.

*Mr. Sherman W. Smith* and *Mr. Victor H. Fall,* for Appellant.

*Mr. Edwin E. Multz,* for Respondents.

MR. JUSTICE ERICKSON delivered the opinion of the court.

The city of East Helena advertised for bids on one unit of fire fighting equipment. Subsequent thereto a bid was accepted

and the contract let. Appellant, a taxpayer, averring the city had accepted a bid higher than the lowest responsible one, brought this action to enjoin the city council from proceeding with the execution of the contract. This appeal is from an order of the district court dissolving a temporary restraining order.

Stripped of all irrelevant matter, the appeal presents but one question: Did the city council abuse its discretion in awarding the contract to one other than the lowest bidder?

Section 5070, Revised Codes, as amended by Chapter 18, Session Laws of 1939, relating to municipal contracts, provides in part as follows: "All contracts for work, or for supplies, or for material, for which must be paid a sum exceeding five hundred ($500.00) dollars, must be let to the lowest responsible bidder after advertisement for bids; provided that no contract shall be let extending over a period of three years or more without first submitting the question to a vote of the taxpaying electors of said city or town."

Such a provision as just quoted is an enactment "for the protection of public interests and must be complied with by the municipal authorities for the benefit of the public. However, these authorities generally have a broad discretion in determining what bid is the one most nearly answering such requirements. In any event the discretion in awarding the contract must be exercised fairly and reasonably within the spirit of the law. The award must be in accordance with the terms of the advertisement, and the contract given to the lowest responsible bidder who complies with the advertised proposals. These provisions should not be so strictly construed as to reduce the authorities to mere ministerial agents, since this would often defeat the purpose for which they are designed, by allowing unscrupulous contractors to defraud the city. On the other hand, if the authorities are vested with too broad discretionary powers the way for fraudulent practices is again left open. Therefore, such provisions are to be applied according to their spirit in a manner best adapted to conserve the public interests. The municipal officers having authority to let con-

466

tracts subject to provisions of this kind, are not purely ministerial officers, * * * [but when acting on these bids their function is quasi-judicial], since their duties require the exercise of discretion." (3 McQuillin on Municipal Corporations, 2d ed., sec. 1329.)

It is settled law that the phrase "lowest responsible bidder" ▆ does not merely mean the lowest bidder whose pecuniary ability to perform the contract is deemed the best, but the bidder who is most likely in regard to skill, ability and integrity to do faithful, conscientious work, and promptly fulfill the contract according to its letter and spirit. (3 McQuillin on Municipal Corporations, 2d ed., sec. 1330, p. 913; 44 C. J., sec. 2208; *State ex rel. Eaves* v. *Rickards,* 16 Mont. 145, 40 Pac. 210, 50 Am. St. Rep. 476, 28 L. R. A. 298; *Brener* v. *City of Philadelphia,* 305 Pa. 182, 157 Atl. 466; *Kratz* v. *City of Allentown,* 304 Pa. 51, 155 Atl. 116; *Wilson* v. *New Castle City,* 301 Pa. 358, 152 Atl. 102.)

Proceeding upon the premise that the city council may exercise discretion in selecting the lowest responsible bidder, we again turn to 3 McQuillin on Municipal Corporations, 2d ed., section 1330, at page 915, wherein it is stated: "Concerning the inquiry, how the responsibility is to be determined, 'the authorities speak with practically one voice,' namely, that the officers in whom the power is vested, 'must determine the fact, and such determination cannot be set aside unless the action of the tribunal is arbitrary, oppressive or fraudulent. The determination of the question of who is the lowest responsible bidder does not rest in the exercise of an arbitrary and unlimited discretion, but upon a bona fide judgment, based upon facts tending to support the determination. The statute will not be so interpreted as to afford a cover for favoritism. The city authorities are required to act fairly and honestly upon reasonable information, but when they have so acted their decision cannot be overthrown by the court.' "

Under the guidance of the foregoing rules, we turn to the ▆ evidence to determine whether a full and careful investigation was made by the city council which, in the exercise of a

sound discretion, furnished it substantial cause to accept as the lowest responsible bid one not the lowest in dollars.

One Mills, the sales representative of the W. S. Nott Company appeared as the sole witness for the taxpayer's cause. The Nott Company's bid was $344.45 lower than that of the Howard Cooper Company, the successful bidder. Their respective bids were $3,155.55 and $3,500. The substance of his testimony is that he had been permitted to give his sales talk to the city council at the time the bids were opened; that the bid he submitted in behalf of his company met the specifications called for in the advertisement for bids in every way; and that his company was a responsible one. Cross-examination disclosed that he had been with the company approximately a year, but he could not say whether any of his company's fire fighting equipment had ever been sold in the state.

Various members of the city council testified in their own behalf, and as a witness, also, they produced the city fire chief. Epitomized and reduced to narrative form, the following comprises the substance of the combined testimony of these witnesses: The city council put on an extensive investigation relative to the type of equipment it should buy. One particular type of equipment was known to some of the council members by reason of the fact that similar units were in service of the state. Such a unit had been seen in demonstration by some of the members at "Racetrack" near Butte. They were impressed by the demonstration and with relation to this particular unit felt they would know what they were getting, should they accept a bid covering it. The fire chief witnessed the demonstration and recommended that the city accept the bid of the company selling that particular equipment. One feature of the demonstrated unit was that it possessed a "Seagraves" pump, which was a nationally known and old line of fire equipment. The rejected bid offered another make of pump, about which the council apparently knew little. The advertisement for bids called for a bronze pump—no particular brand being specified. The Seagraves pump was all bronze, and the other only partly so.

468

Generally speaking, the rejected bid, as well as the accepted one, measured up to the specifications as advertised, with the exception noted above. However, in making its selection as between the two it is apparent that the city council considered also the various types of service offered by the two competing companies. One councilman testified: "Well, one thing we did know that the Howard Cooper Company has a representative traveling around the different cities that takes care of trucks and shows you how to operate them when the truck arrives. He also comes back once a year, or when he ever happens to be close to the vicinity, to service the truck, and any information you want, he is glad to give to you. He is a very competent man that has been in the service 24 years, as a fire chief, or representative." This information was not of witness' own knowledge, but is what had been told the council during its investigations. Another reason advanced by the same councilman for considering the accepted bid as being from the most responsible bidder, was (in speaking of the company whose bid was rejected): "Well, what I thought is that I didn't know of any equipment they have in the state of Montana outside of an old pump or something they have at Philipsburg, I believe it is. Some one told us that they have a small booster pump up there. Outside of that I didn't know of any other equipment they have in the state of Montana." In contrast he testified in response to a question pertaining to the responsibility of the successful bidder: "Well, they have sold a lot of equipment to the government and a lot of equipment to the state of Montana."

The city fire chief, who had recommended the purchase of the equipment sold by the successful bidder, and who also had participated in the investigation which preceded the purchase of the new unit, testified as follows: "I saw that Howard Cooper unit in Butte in operation and I felt it was something, we were getting something we knew what it was. I recommended it due to the fact that I saw it in operation and I knew what we were getting; that is all. As far as any responsibility is concerned, I didn't even consider that." Question: "Did you inquire, or did you find out about any other bid, after you saw that

truck in operation? Did you look into any of the other bids at all?" Answer: "No, I didn't. I was entirely sold on it. I asked Mr. Mills [sales representative heretofore mentioned] where we could look at his equipment and he said Philipsburg, I think, or was it Shelby he said. It hasn't any comparison with what we want; it is just a small unit, a little thing." Question: "Did the price make any difference to you in your recommendation at all?" Answer: "I thought it was well worth the difference of $300 to know what we were getting."

Another councilman testified relative to his reasons for favoring the bid accepted: "The only thing I said was that the Howard Cooper bid was the best bid on the grounds it was a Seagraves bronze pump, which is a nationally known pump, and also there may be some value, when you buy equipment for a service man to come and check the equipment once a year, or when he travels through the territory." Regarding the difference in price he said: "Well, I thought for the matter of a few hundred dollars more we were getting better service, getting a better truck, and it made no difference, a few hundred bucks."

Finally one testified: "Well, in the first place, Mr. Mills was asked the question, for one thing, about the running boards on the truck. I asked the question how many men could stand on it. He looked at the picture and he said: 'I don't know; I think about eight.' So I thought right then he didn't know exactly. Another question, I asked him about repairing the truck, the pump part. Well, he made the remark, I understood him to say it would be all right, the factory guarantees it. On the other hand we have to take it out and ship it back there to get it repaired. This other company, the other fellows haven't mentioned, I personally asked the question: 'Now, if the pump goes haywire, or the truck goes haywire, what are we going to do about it?' 'The Anderson Motor Company will fix the truck,' he said, 'and if it is the fire equipment, they will send a man out from Spokane. Just wire them and they will send a man out from the plant, free of charge, to keep the

truck in repair.' '' This assurance as to repairs was not in a written contract, but in the words of the councilman just testifying, ''He just told us that.'' And, although the council might have no enforceable right to this free service, yet in exercising its discretion it might consider and take into account this assurance.

From this synopsis of the evidence it is obvious that substantial reasons guided the city council in exercising its discretion as it did in accepting the bid of the Howard Cooper Company. To summarize: While the specifications requested by the advertisement for bids were substantially met by both companies, the fact is that the company whose bid was accepted occupied the advantageous position of having certain of its equipment in the state which was made accessible to the inspection of the city council. Having seen it in demonstration, there was the feeling of assurance that, should they purchase that make of equipment, they would know what they were getting, and to so know would well be worth the few hundred dollars difference in price. The fact that the Howard Cooper unit was equipped with an all bronze Seagraves pump, an old and nationally known line of fire fighting equipment, in no small manner influenced the decision of the council. Finally, there appeared to exist the general belief that better service would be obtained from the Howard Cooper Company in the event the truck, or any of the equipment mounted thereon, should need repair; certainly such a factor would be one rightly to be considered in deciding between the bids.

It is our opinion from the record here presented, that the city council conducted a fair and sufficient investigation into the relative merits of the two bids considered, and, as a result thereof, substantial plausible reasons based on reasonable information were presented justifying it in exercising its discretion in the manner it did. The investigation appears to have been carried on honestly and with the best interests of the citizens and taxpayers of East Helena foremost in mind. In the absence of any showing of bad faith, fraud, or corrup-

tion, we cannot say, as a matter of law, that the city council abused its discretion.

The order appealed from is affirmed.

Mr. Chief Justice Johnson and Associate Justices Angstman, Anderson and Morris concur.