**MELTON et al. v. CHEROKEE OIL & GAS CO.**

No. 7702—Opinion Filed Jan. 9, 1917.

On Rehearing, Feb. 12, 1918.

(170 Pac. 691.)

**1. Oil and Gas—Lease—Operation—Forfeiture.**

An oil and gas lease containing a stipulation on the part of the lessee to commence operation on the premises within a year from a date certain or pay for delay conferred on the lessee an option to drill or pay, and a failure to do either rendered the same forfeitable at the choice of the lessor.

**2. Same — Provision for Avoidance —Effect.**

Where such lease contains a clause reserving to the lessee the right at any time to remove all his property and reconvey the premises, and thereby render such lease null and void, held, that a corresponding right existed in the lessor before development to compel a surrender.

**3. Specific Performance—Optional Performance—Equity Jurisdiction.**

A court of equity will not award relief in the nature of specific performance of a contract which is not certain, fair, and just, or where performance by the complaining party is entirely optional.

(Syllabus by Bleakmore, C.)

Kane and Miley, JJ., dissenting.

Error from District Court, Rogers County; W. J. Campbell, Judge.

Action by the Cherokee Oil & Gas Company, plaintiff, against Charles L. Melton and others. Judgment for plaintiff, and defendants bring error. Reversed, and cause dismissed with prejudice for want of equity.

Tillotson & Elliott, for plaintiffs in error.

William P. Thompson, C. B. Holtzendorff, H. Tom Kight, and P. W. Holtzendorff, for defendant in error.

J. L. Skinner and W. W. Pryor, amici curiae.

Opinion by BLEAKMORE, C. This suit was commenced in the district court of Rogers county by the Cherokee Oil & Gas Company, as plaintiff, against Charles L. Melton, Addie M. Melton, G. E. Slaugenhop, C. M. Eichorn, and C. C. Johnson, as defendants, seeking the cancellation of a certain oil and gas drilling contract theretofore entered into between the defendants, to enjoin them from entering upon the land described in such contract for the purpose of drilling for oil and gas, and from interfering with the plaintiff in its operations upon the premises, under a prior lease, etc. Defendants answered alleging the invalidity of the lease under which plaintiff claimed, and prayed for its cancellation, etc. There was judgment for plaintiff, from which defendants have appealed. The parties are referred to here as they appeared in the trial court. The lands involved are 120 acres situate in the southeast ¼ of section 28, township 24 north, range 17 east.

On January 7, 1902, the Secretary of the Interior, under authority conferred upon him by act of Congress, entered into an oil and gas mining lease for a term of 15 years with the plaintiff, covering the whole of section 28, by the terms of which plaintiff undertook to sink wells, operate the same, and pay certain advanced royalties, rentals, etc.,

which instrument is hereafter referred to as the "secretarial lease." The lands described therein were later allotted and patents therefor issued to members of the Cherokee Tribe. By virtue of congressional enactment the portion here involved subsequently became alienable, and was conveyed to the defendant Charles L. Melton.

Thereafter, on July 16, 1913, Charles L. Melton and the Cherokee Oil & Gas Company entered into an oil and gas mining lease (hereafter designated as the "commercial lease"), covering the 120 acres in question, and containing the following provisions:

"1439. Oil and Gas Lease.

"In consideration of the sum of one and no/100 dollars, and the release from secretarial lease No. 7 and of the covenants and agreements hereinafter contained, Charles L. Melton, first party, hereby grants unto Cherokee Oil & Gas Company, a corporation, second party, heirs, successors, and assigns, all of the oil and gas in and under the following described premises, together with the right to enter thereon at all times for the purpose of drilling and operating for oil, gas, or water, to erect, maintain, and remove all buildings, structures, pipes, pipe lines, and machinery necessary for the production and transportation of the oil, gas, or water, provided that the first party shall have the right to use said premises for farming purposes, except such as is actually occupied by second party. * * *

"The above was made on the following terms:

"First. Second party agrees to commence operations on said premises within one year from date of release from secretarial lease or pay $1 per acre per annum until the first well is completed or the property hereby granted is conveyed to the first party.

"Second. Should oil be found in paying quantities upon the premises, second party agrees to deliver to first party, in the pipe line which it may connect the well or wells, the one-eighth part of the oil produced and saved from premises.

"Third. Should gas be found, second party agrees to pay first party $150 per annum for every well from which and while gas is sold for commercial purposes therefrom off said premises. * * *

"Sixth. Second party may at any time remove all his property and reconvey the premises hereby granted, and thereupon this instrument shall be null and void.

"The second party agrees that a sum of money shall be paid to the first party upon the delivery of this lease, the amount to be determined by the number of acres in the description above multiplied by the pro rata per acre of advanced royalty to the United States Indian superintendent at the time the secretarial lease is canceled, or the foregoing stipulations to be complied with, unavoidable delays excepted."

This lease was placed in a bank with the understanding between the parties that it was to be delivered to the plaintiff upon payment of the accumulated royalties due defendant Melton, under the terms of the secretarial lease and the release of that instrument.

Pursuant to such agreement and the terms of the commercial lease on August 27, 1913, plaintiff executed the following release of the secretarial lease:

"Release.

"The undersigned Cherokee Oil & Gas Company, lessee in a certain oil and gas mining lease executed by the Secretary of the Interior in favor of the undersigned lessee, date June 7, 1902, covering section 28, township 24 north, range 17 east, 410 acres, more or less, hereby releases, relinquishes, and surrenders all right, title, and interest in and to the foregoing lease, in so far as it pertains to the following described land: * * * Said land being located in Rogers county, state of Oklahoma.

"Effective from date of approval hereof by the Secretary of the Interior."

Such release was approved by the Secretary of the Interior October 13, 1913, although it appears that the superintendent of plaintiff did not have actual notice thereof until January 5, 1915, and the release was not returned to the plaintiff until about February 13, 1915. The royalties due Melton under the provisions of the secretarial lease had been received by him long prior to this time.

Up to February 14, 1915, plaintiff had neither commenced operations on the premises nor offered to pay the $1 per acre per annum delay money. On that day, however, asserting its rights under the commercial lease, it tendered to Melton a check for $120, which he then declined to accept. On the following day the drilling contract between defendants, the cancellation of which is sought by plaintiff, was entered into.

Thereafter plaintiff attempted to move machinery upon the premises for the purpose of drilling a well, but was prevented by defendants, whereupon this action was begun. A temporary retraining order against defendants was issued, which was subsequently dissolved, and defendants commenced the drilling of a well, which was sunk to a depth of about 100 feet, when their operations were interrupted by the appointment of a receiver, who took charge and completed such well.

Beyond question all the rights of the plaintiff to the lands involved by virtue of the secretarial lease were surrendered by the release thereof, and, according to the express terms of such release and of the commercial lease, ceased to exist upon the approval of the release by the Secretary of the Interior. The authority of the Secretary in this regard and the efficacy of his approval of such release need not be considered. By the commercial lease it was stipulated:

"Second party agrees to commence operations on said premises within one year from date of release from secretarial lease or pay $1 per acre per annum until the first well is completed or the property hereby granted is conveyed to the first party."

And by the release it was provided that it should be "effective from date of approval hereof by the Secretary of the Interior."

From the provisions in these instruments it is obvious that the parties intended that the date of the approval of such release should definitely fix the time at which the commercial lease should become effective, and within one year from which the plaintiff should commence operations on the premises or pay to the lessor $1 per acre per annum.

Plaintiff defaulted in the performance of the commercial lease contract by failure to either commence operation or pay the delay money within the period specified therein. Such contract constituting an option to commence operations or pay, the failure to do either rendered the same forfeitable at the choice of the lessor. The lessor exercised his power in this respect by declining to accept the delay money after the expiration of the year and entering into a contract with other parties, and thus all rights of the plaintiff under the provisions of the commercial lease were forfeited.

In Brown v. Wilson, 58 Okla. 392, 160 Pac. 94, it was held:

"Where an oil and gas lease was made, executed, and delivered for the consideration of $1 in hand paid the lessor, and the covenants and agreements hereinafter contained on the part of the lessee, and leased and let to him a certain tract of land for a term of ten years and as long thereafter as oil and gas or either were produced therefrom by the lessee, he to yield to the lessor certain royalties from the oil and gas produced, and where the lessee agreed to complete a well on the premises within four months from the date thereof or pay at the rate of $80 in advance for each three months such completion was delayed, held, that the $1 supported the four months' period in which the lessee had to complete a well, and supported no other stipulation in the lease; that the prospective royalties were the sole consideration for the execution of the lease on the part of the lessor; that the agreements on the part of the lessee to complete a well on the demised premises within four months or pay for delay conferred an option on the lessee to drill or pay; and that a failure to do either forfeited the lease at the option of the lessor, who thereafter was entitled to have the same judicially declared forfeited and canceled as a cloud upon his title."

By the commercial lease it was also stipulated:

"Second party may at any time remove all his property and reconvey the premises hereby granted, and thereupon this instrument shall be null and void."

In Brown v. Wilson, supra, it was held:

"Where such lease reserves to the lessee and his assigns the right at any time after four months, on the payment of $1 and all payable obligations then due the lessor or his assigns, to surrender the lease, if not tested, for cancellation, held that, as said lease, construed as a whole, confers on the lessee an option to complete a well within four months or pay for delay and a further option to surrender at any time after four months, and thereby avoid doing both, it was voidable at the option of the lessor at any time after four months for lack of mutuality, in that it imposed no legal obligation on the lessee; that, as prospective royalties were the sole consideration for the execution of the lease on the part of the lessor, payment of which could be defeated by a surrender thereof by the lessee, the lease was nudum pactum; and that, as the same reserves to the lessee the right to surrender the lease at any time after four months before development, a corresponding right exists in the lessor to compel a surrender."

It will be observed that by the terms of the commercial lease the lessee had the right to surrender the lease at any time before or after the expiration of the year and thus render the lease null and void.

In Brown v. Wilson, supra, it is said:

"We are therefore of opinion that, as the lease in question conferred on the lessee the right to surrender the lease at any time after four months before development and thereby terminate the same, a corresponding right existed in the lessor to compel a surrender and terminate the same before development, which he did by making the second lease and yielding possession of the land to the second lessee."

We conclude that by reason of the provisions of the commercial lease under consideration there was no obligation upon the plaintiff either to drill or pay rent, but

the doing of either was entirely optional with it, and that as the provisions of the lease gave the lessee the right to surrender it at any time, without further obligation on its part, a corresponding right existed on the part of the lessor to compel a surrender.

Again, the relief sought by plaintiff is in the nature of a decree for specific performance of the commercial lease, which contains a surrender clause giving the lessee the option to terminate it at any time, and as we have seen, such lease is not certain, fair, and just in all its parts. The plaintiff had not performed the contract on its part, nor placed itself in a position where it could be compelled to perform.

In Hill Oil & Gas Co. v. White et al., 53 Okla. 748, 157 Pac. 710, this court held:

"A surrender clause in an oil and gas lease, which gives to the lessee an option to terminate such lease at any time, deprives the lessee of the right to specific performance, until it has performed the contract or placed itself in such a position that it might be compelled to perform the same on its part."

See, also, Kolachny v. Galbreath, 26 Okla. 772, 110 Pac. 902, 38 L. R. A. (N. S.) 451; Superior Oil & Gas Co. v. Mehlin, 25 Okla. 809, 108 Pac. 545, 138 Am. St. Rep. 942.

In Federal Oil Co. v. Western Oil Co. et al., 121 Fed. 674, 57 C. C. A. 428, United States Circuit Court of Appeals for the Seventh Circuit, it was said:

"The bill alleges compliance by the appellant with the stipulations of the instrument; the payment by it of $8.75 per month in advance; that the tender of $8.75 on October 19, 1901, was refused by the Bradfords, who, ignoring the rights of the appellant, placed the Western Oil Company, appellee, in possession, which company, with knowledge of the rights of the appellant, had placed machinery upon the land, had made excavations, and were drilling thereon for oil and gas; that subsequently thereto, and on November 14, 1901, the appellant moved material upon the land for the purpose of erecting a rig thereon to be used in drilling for oil and natural gas, which material was removed by the Western Oil Company, with the knowledge and approval of the Bradfords, and cast upon the highway. The bill alleges that the acts complained of constitute a lien and cloud upon the leasehold title of the appellant, removable only in equity, that it has no adequate remedy at law, and prays an injunction suitably restraining the appellees, and a decree to establish the title of the appellant, and to subordinate all rights of the appellees to the title of the appellant. * * * The appellant had the right at any time to remove its property and cease operations without respect to the interests of Bradford,

and with respect only to its own interest; and it could cancel and annul the contract, or any part thereof, at any time. There was here an entire want of mutuality—an utter absence of obligation on the part of the appellant. Equity will not specifically enforce a contract against one party when it cannot be specifically enforced against the other. Marble Company v. Ripley, 10 Wall. 339, 359, 19 L. Ed. 955; Karrick v. Hannaman, 168 U. S. 328, 336, 18 Sup. Ct. 135, 42 L. Ed. 484. * * * The only effect of a decree would be to drive the appellees out of possession and put the appellant in possession, allowing it to hold the land indefinitely without action upon its part, and to exploit adjacent lands for natural gas and oil, if it had acquired the right so to do, and thus to defeat any participation by Bradford in the oil which may be beneath the surface of his land. It is no answer to say that the appellant could only do this upon monthly payments to Bradford of $8.75, for that would not compensate him for his share of the oil which it was hoped would be developed, and would permit the appellant, if it had obtained like rights upon adjoining lands, and should, by drilling thereon, develop the presence of oil, to obtain the oil beneath the surface of Bradford's land without any participation therein by him. Nor does the fact that the monthly payments had been made for some months after the contract remove from this agreement the want of mutuality. That payment was not part performance of the contract, but merely the stipulated sum for delay in performance. Contracts unperformed, optional as to one party, are optional as to both. The contract here was determined by the act of Bradford refusing to receive the stipulated sum for further delay, and by placing the Western Oil Company in possession."

The judgment of the trial court should be reversed, and the cause dismissed with prejudice for want of equity.

By the Court: It is so ordered.

### On Rehearing.

TURNER, J. As the terms of the escrow agreement were that the commercial lease was to be delivered to the company upon payment of the accumulated royalties due Melton under the terms of the secretarial lease and the release of that lease by the Secretary of the Interior, it is urged by counsel for Cherokee Oil & Gas Company that, although on March 14, 1914, the company paid Melton said accumulated royalties and the commercial lease was by the escrow bank delivered to said company, the release of the secretarial lease was a condition precedent to its right to a delivery of the commercial lease and was not performed in this: That both approval and notice of the approval of the release from the secretarial lease by the Secretary of the Interior

were, as a matter of law, required to be performed in order to discharge said condition precedent, and that although the Secretary, by notation on the release dated October 13, 1913, approved the same, inasmuch as he was required by a rule of the Department, but failed to give the company notice of his approval, and no actual notice thereof was imparted to the company until January 5, 1915, the condition precedent was not performed until that date, and hence the release did not, till then, become effective so as to entitle the company to a delivery of the commercial lease and the subsequent investment of their rights under said lease. In other words, it is urged that notice of the approval was in law part of the approval, and, until the company had such notice, that the condition precedent was not performed, and hence no right to the delivery of the commercial lease accrued to the company, and hence their rights under the lease did not begin to run until such notice was received.

Not so. This for the reason that, at the time of the act of approving the release of the secretarial lease by the Secretary, no rule or regulation existed requiring him to give notice of such approval or of the release of a departmental lease. Section 26 of the Rules of the Secretary, promulgated April 20, 1908, which provides:

"Operations upon land covered by any lease requiring the approval of the Secretary of the Interior are not permitted until after such lease is regularly approved, delivered, and official notice thereof given"

—has no application here, since the commercial lease, being upon unrestricted lands, did not require and was not submitted to the Secretary for his approval; and hence no notice of such action on his part was necessary to enable the lessee company to commence operations under that lease.

For the same reason, section 26 as amended and promulgated June 1, 1913, which reads:

"Operations will not be permitted under any lease requiring approval of the Secretary of the Interior, until the approved lease has been delivered"

—has no application here, for the reason that both sections apply to leases upon restricted lands only.

But, assuming it was the duty of the Secretary, under a rule having the effect of law, to give the notice, the act of approval of the release only operated to discharge the condition precedent, and notice of the approval was no part of the release or the approval itself. This for the reason that the act of approval of the release only was necessary to release the secretarial lease and discharge the condition precedent. Such approval involved judicial action only on the part of the Secretary, and, when the Secretary received from the company the release of the secretarial lease which, showing the intention of the parties, closed with, "Effective from the date of approval hereof by the Secretary of the Interior," and in evidence of his official sanction thereto, wrote upon it, "Department of Interior, Washington, D. C., Oct. 13, 1913, approved," and signed his name thereto, he thereby exercised all the judicial power vested in him by law necessary to accomplish an approval of the release of the company from the secretarial lease; whereupon the condition precedent was literally performed and the company's right to a delivery of the commercial lease accrued. And that, too, whether the Secretary gave notice to the company that the condition precedent had been performed or not. In other words, the release was complete upon the exhaustion of the Secretary's judicial power upon it by the act of approval, as stated, and, if the law charged him with the subsequent duty of giving notice thereof and he neglected to do so, the same would in no manner affect the release already an accomplished fact. Construing the escrow agreement, the release, and the commercial lease together as parts of one and the same transaction, it is clear that, as said lease is in consideration, among other things, of a release from the secretarial lease, the estate thereby conveyed was intended to vest only upon the performance of that condition precedent.

In Paraffine Oil Co. v. Cruce, 63 Okla. 95, 162 Pac. 716, quoting from 4 Kent, 125, we said:

"A precedent condition is one which must take place before the estate can vest or be enlarged; as if a lease made to B. for a year, to commence from the 1st day of May thereafter, upon condition that B. pay a certain sum of money within the time, or if an estate for life be limited to A. upon his marriage with B., here the payment of the money in the one case and the marriage in the other are precedent conditions, and, until the condition be performed, the estate cannot be claimed or vest. Precedent conditions must be literally performed, and even a court of chancery will never vest an estate, when, by reason of a condition precedent, it will not vest in law."

Which means, when applied to the facts in this case, that it was the act of approval itself of the release from the secretarial

lease which operated to release that lease and discharge the condition precedent to the delivery of the commercial lease and the consequent vesting of that lease, and not subsequent notice of that action to the grantee in the commercial lease—an act, it seems, of which the company was chargeable with notice, since the company alone caused it to be performed. This doctrine is applicable to all sorts of estates. Brewster on Conveyancing, § 170, says:

"Express conditions may be either conditions precedent or conditions subsequent. A condition precedent is one which must be fulfilled before the estate dependent upon it can come into existence; prior to the fulfillment of the condition no estate passes from the grantor to the grantee, while after its fulfillment the grantee has an absolute and unconditional estate. For example, a conveyance to a city of land for a park, provided that the city obtains authority from the Legislature to remove bodies from the cemetery on the land conveyed within a certain time, is a grant on condition precedent, and the failure of the city to obtain this authority prevents its taking title. Or a devise to one on condition that he, within a named time, shall come under the guardianship of a relative of the testator is a devise on condition precedent, and because of nonfulfillment of it the devisee takes no estate."

In King v. Warfield et al., 67 Md. 246, 9 Atl. 539, 1 Am. St. Rep. 384, the headnotes read:

"An instrument of writing under seal, purporting to be a lease, provided that it should not be binding on the lessee in any way until he should be appointed and installed by the proper officers of the Baltimore & Ohio Railroad Company, as freight and ticket agent of the said company at a particular station. The lessee, although not appointed by the officers of the railroad company as such agent, elected that said lease should be binding on him, and demanded possession of the demised premises from the lessors. They refused to deliver possession, and in consequence of such refusal, they were sued by the lessee to recover damages. The defendants demurred to the declaration. Held, that the contract was to become binding upon both parties only when the plaintiff obtained the appointment of freight and ticket agent which he was seeking, and as that contingency, which was dependent upon the action of third parties, had not happened, the plaintiff was free from all obligations intended to be created by the instrument under seal, and was therefore in no position to maintain a suit against the defendants for the alleged nonperformance of a contract by which he was not bound."

In the body of the opinion the court said:

"The proper construction of this executory contract is that it was to become binding upon both parties when the appellant obtained the appointment he was seeking to obtain. It would become operative as soon as that contingency happened, and not before. As that contingency, which was dependent on the action of third parties, has not happened, the appellant is free from all obligations, and is therefore in no position to maintain a suit against the appellees for an alleged nonperformance of a contract by which he is not bound in any respect."

In Long v. Swindell, 77 N. C. 176, it is said that, where the grant of an easement is upon a condition precedent, it cannot be enjoyed by the grantee until the condition is performed. Of course the converse of the proposition is true, and when the condition is performed the grant becomes absolute eo instante and by operation of law. That was a suit to recover damages for flowing water through plaintiff's ditches and to restrain the same. Defendants relied upon a deed from plaintiff, purporting to convey the easement so to do. The court said:

"In the deed under which the defendants claim, the grant of the easement is expressly made conditional upon the acquisition by the grantees, of a right to drain through the Stanly canal, and provision is made for their enlarging that canal in conjunction with the plaintiff. The deed, after reciting that Boomer and Litchfield owned adjoining lands which they could not conveniently drain except through the land of the plaintiff, and that plaintiff had a right to drain his own land only through the Stanly canal, and that said plaintiff was willing 'to grant a privilege therefor on certain conditions, etc.,' says: 'Now if said Boomer and Litchfield shall procure from the owner of said [Stanly] land, a right to drain or ditch, etc., of sufficient width and compass to discharge and carry off all the water which may be forced down the drains hereinafter granted them through my land, and shall in conjunction with myself, cut out and keep open said canal leading to Wysocking [the Stanly canal], etc.' 'Then this indenture witnesseth,' that said Long grants to Boomer and his heirs and assigns, an easement to cut into Long's ditch; and also grants to Litchfield and his heirs and assigns, a similar easement. * * * Then the said Boomer and Litchfield severally covenant for themselves and their respective heirs and assigns, to keep open and in good order 'the said ditch.' * * * The word 'if' is an apt one to express a condition precedent to the creation of an easement, and the whole language and frame of the deed show that it was the intention of the grantor that the grant should not go into effect, at least, until the grantees had acquired an easement in the Stanly canal."

Lusk v. McNamer, 24 Miss. 58, was a suit to recover possession of a slave. Complainants were the stepchildren of one Bridges,

and he their father's administrator. They claimed title to the slave by deed of gift from Bridges, conditioned that the gift was to vest upon the release by complainant's guardian of his claim against Bridges for their distributive shares of their father's estate for which Bridges was liable. Their guardian, subsequently appointed, refused to release Bridges and demanded payment; whereupon Bridges, failing to pay, mortgaged the slave to another to raise the money, after which it was sold under the mortgage and the question was whether title to the slave had vested in complainants. In the headnotes the court said:

"The deed of gift in this case was conditional, to take effect upon the release of B. from his liabilities as administrator; and this was a condition precedent, without the performance of which a title could not vest in the grantees."

In the headnotes to Stockton v. Weber, 98 Cal. 433, 33 Pac. 332, it is said:

"A proviso in a grant, bargain, and sale deed of a block of land to a city, to be kept as an ornamental square and for the erection of public buildings thereon, 'provided the city by its legal representatives obtains authority from the Legislature of this state, and makes the necessary removals of the dead from the said block within twelve months from the 1st day of January, A. D. 1891,' is a condition precedent, and the failure of the city to perform such condition prevents title from vesting in the city under the deed.'"

13 Cyc. 688, says:

"Conditions precedent are such as must happen or be performed before an estate can vest or be discharged. They must be strictly, literally, and punctually performed. The estate will vest, however, upon strict and punctual performance, where there are express words to that effect, or where it is the intention, deducible from the entire instrument to create a condition precedent."

See, also, Johnson v. Warren, 74 Mich. 491, 42 N. W. 74; Parmelee v. Oswego & Syracuse R. R. Co., 6 N. Y. 74; Brannon v. Mesick et al., 10 Cal. 95; Dennehy & Co. v. McNulta et al., 86 Fed. 825, 30 C. C. A. 422, 41 L. R. A. 609; Pearl v. Lockwood, 123 Mich. 142, 81 N. W. 1087; Emery, etc., v. Dana, 76 N. H. 483, 84 Atl. 976; Wilson et al. v. Galt et al., 18 Ill. 431; Am. Bankers' Ins. Co. v. Thomas, 53 Okla. 11, 154 Pac. 44.

And so we repeat that the condition precedent to the delivery of the commercial lease and the consequent vesting of the company's rights under that lease being the release of the secretarial lease, when the Secretary, in evidence of his official sanction thereto,

wrote upon the release of the secretarial lease, "Approved," said lease was ipso facto released and the condition precedent was performed. But whether said lease became effective eo instante upon the performance of said condition precedent, or on March 14, 1914, the date of the delivery thereof to the company by the escrow bank, we need not say for the reason that as the lease obligates the company to commence operations on the demised premises within one year from the date of the release of the secretarial lease, which we have just held was October 13, 1913, or pay, and the company did neither, the lease was subject to forfeiture and should be forfeit, as held in the opinion.

We said awhile ago that by the act of approval the secretarial lease was ipso facto released for the reason that the discharge of the condition precedent necessitated approval only of the release by the Secretary to accomplish that result; that such contemplated judicial action only on his part, which was duly exercised when he wrote upon the release "Approved," and signed the same. And the fact that the law charged him with the mere ministerial duty of thereafter giving notice of the performance of the condition precedent had nothing to do with the performance of the condition precedent already performed. Again we say this approval was a judicial act.

4 Words and Phrases, 259, under "Judicial Act," says:

"Official action, the result of judgment or discretion, is a judicial act." Citing Grider v. Talhy, 77 Ala. 422, 54 Am. Rep. 65; People v. Jerome, 36 Misc. Rep. 256, 73 N. Y. Supp. 306.

In 1 Words and Phrases, 259, under "Approval," we find cited Fuller v. Board of University, etc., 21 N. D. 212, 129 N. W. 1029, where, construing an act providing for the approval of school land sales by the board, the court held the act of approval to be quasi judicial, as distinguished from a mere ministerial act, and that:

"The very act of 'approval' imports the act of passing judgment, the use of discretion, and the determination as a deduction therefrom unless limited by the context of the statute."

Also:

"To give 'approval' is in its essential and most obvious meaning to confirm, ratify, sanction or consent to some act or thing done by another. State v. Rhein, 127 N. W. 1079, 1081, 149 Iowa, 76."

Under "Approve":

"The word 'approve' is 'to regard or pronounce as good; think or judge well of;

admit the propriety or excellence of; be pleased with: commend' Under such definition, the approval by the president of an insurance company provided for in the policy, reciting that after forfeiture the insured could be reinstated provided his application was first 'approved' by the president of the company, was not a mere ministerial act, but involved the exercise of judgment and discretion. * * * Lane v. Fidelity Mut. Life Ins. Co., 54 S. E. 854, 855, 142 N. C. 55, 115 Am. St. Rep. 729 (quoting 1 Words and Phrases, 475; Webster's International Dict.)"

In Wykoff et al. v. W. H. Wheeler & Co., 38 Okla. 771, 135 Pac. 399, the act required that the books be furnished under contract and bond by the successful bidder, the bond "to be approved by the Governor," and "if the bond * * * is * * * duly approved the board shall approve the contract." Construing which, we held that the action of the Governor in approving the bond a condition precedent to the right of the board to approve the contract, and without the approval of the Governor the contract was no contract. In support of which we cited State ex rel. v. Smith, Governor, et al., 23 Mont. 44, 57 Pac. 449, which holds that the duty of the officer to approve the contract let by the board was not ministerial, but involved judicial discretion, and hence judicial action, which could not be controlled by mandamus. See, also, Dunham, City Clerk, v. Ardery, 43 Okla. 619, 143 Pac. 331, L. R. A. 1915B, 233, Ann. Cas. 1916A, 1148.

From which we learn, construing the escrow agreement, the release of the secretarial lease, and the commercial lease together as parts of one and the same transaction, that the intent of the parties thereto was to make the latter effective from the date of the act of approval of the former by the secretary, which was to be the date on which he passed his judgment thereupon, and, in the use of his discretion, determined whether the same should be approved and, if so, indicated his judgment in the premises by his indorsement thereupon to that effect. It would seem self-evident that if, as a condition precedent to the delivery of a deed and the consequent vesting of an estate, the deed should fix the time as from the date of the approval of a certain proposed act of the Legislature, the deed would mean, and the intent of the parties thereto would be, the date of the approval and not the publication of the act, although the law required its publication subsequent to its approval. It would also seem self-evident that, if as a condition precedent to the vesting of any license, easement, or estate in land evidenced by deed, the grantor in the deed should fix the contingency of his son John's return from Rome, the fee would

vest upon the day of the happening of that event, whether the devisee had knowledge of the happening of that contingency or not.

So here the condition precedent to the delivery of the lease and the consequent vesting of the company's rights under the commercial lease was contingent on the release from the secretarial lease. A release was prepared by the company and sent to the Secretary for his approval, which was necessary before the release could take effect. He exercised his judicial power in the premises and marked it "Approved," and signed and dated it. It is self-evident that such was the date when the secretarial lease was released, and hence the date upon which the condition precedent to the delivery of the commercial lease was performed; and that, too, whether the Secretary ever notified the company of his approval of the release or not, since the performance of the condition precedent was made to turn upon the release from the secretarial lease, and not notice by the Secretary to anybody of the approval of that release, or further act on his part or on the part of any one else.

We are therefore of opinion that the condition precedent to the delivery of the commercial lease and the vesting of the company's rights thereunder was performed when the Secretary marked "Approved" its release from the secretarial lease; and whether said lease thereupon, or upon its delivery, became effective, we need not say, for in either event, as under its terms the company was obligated to commence operations on the premises demised within one year from the date of the release from the secretarial lease, which it failed to do, and let the year expire without the payment of delay money as stipulated in the lease, the lease was subject to forfeiture, and should be forfeit for the reasons stated in the opinion.

Of course, what we have said would place it in the power of the Secretary to approve the release "in the privacy of his office" and leave it to the vigilance of the company to watch his action and ascertain the date of his approval of the release of the secretarial lease in order to determine the date from which it was obligated to commence operation under the commercial lease. But, as the company was obligated to discharge or procure to be discharged the condition precedent, and made no provision to be informed of the action of the Secretary in the premises, which itself had invoked, and, after submitting the release for his approval, never at any time took the trouble to inquire and were not informed of his action

until after, by his approval of the release, their rights had not only vested, but five months of the time had expired in which, by the terms of the commercial lease, they had a right to enter and explore and thereafter wholly expired without entry or exploration, we see no hardship in holding, in effect, that in the absence of any rule or regulation requiring the Secretary to notify the company of his approval of their release, the company was chargeable with the duty of ascertaining for itself and at its peril the happening of that contingency. And that, having made no such provision, or exercised any vigilance at all, it must suffer the consequences of its own laches.

And neither is the plaintiff, the lessor, Melton, estopped from claiming a forfeiture of the commercial lease on the undisputed facts, as contended by the company. This for the reason that no estoppel is pleaded. But, aside from any question of pleading, there is no estoppel here. The facts are: That after the execution of the commercial lease, on July 13, 1913, it was placed in a bank at Chelsea in escrow, with the understanding, between all parties in interest, that, when the company's release of the secretarial lease was approved by the Secretary of the Interior, said lease would be delivered to the company upon the payment by it to the lessor, Melton, of a certain sum of money, "the amount," as stated in the lease, "to be determined by the number of acres in the description above multiplied by the pro rata per acre of advanced royalty to the United States Indian superintendent at the time the secretarial lease is canceled. * * *" Accordingly, on August 27, 1913, the company executed its release of the secretarial lease, indorsing thereon, "Effective from the date of approval hereof by the Secretary of the Interior," thereby not only showing the intention of the parties in interest that the same was intended to be effective from that date, but, in effect, requesting the Secretary to make it so, and sent it to him for his approval. This he did by approving the release on October 13, 1913, whereupon, on March 14, 1914, the company, as lessee under the commercial lease, paid or caused to be paid Melton the accumulated royalties aforesaid (payable only on the contingency that the Secretary approve the release, which contingency, it says, it did not know had happened) amounting to $768, being the amount due under the secretarial lease at the time of the approval of the release thereof, and took that lease out of escrow. From that time on, although with this lease in its possession which

obligated the company to commence operations upon the demised premises within one year from the date of the release of the secretarial lease (October 13, 1913) or pay for delay, the company did neither up to February 14, 1915, or one year and four months thereafter, at which time it tendered the lessor, Melton, a check for $120 as the first year's delay money, which he refused to accept, and on the following day executed the lease to Slogenhop, which the company in this action seeks to set aside, claiming that, under this state of facts, and the fact that Melton, when he was tendered said check for $120, being then on a deal to lease the land to Slogenhop, handed back the check with the remark that he wanted to look into the matter a little, and the next day closed the deal with Slogenhop, and on the further fact that, about the first part of February, 1915, when the company was wholly in default and after a well had been brought in near the property, he (Melton) stated to one of the company that under present conditions he did not care whether his land was drilled on or not, he is estopped to claim a forfeiture.

As no claim, much less proof, is made that any act or omission of Melton caused the company to change its position to its injury, he is not estopped to invoke a forfeiture of the commercial lease. In this connection it might be well to say that we are impressed that this tender of $120, made, as it was, on February, 14, 1915, was at the time an implied recognition and a practical construction by the company of the commercial lease, in effect, that the date from which it was obligated to commence operations thereunder was October 13, 1913, the date of the approval of the release of the secretarial lease. This for the reason that, had the term of said lease begun to run, as the company now contends, on January 5, 1914, the year within which the company had to commence operations thereunder would not have been ended at the time of the tender, and hence no delay money would have been due at that time. By making tender, the company construed the term of the lease as commencing October 13, 1913, and to now contend that it commenced on notice of the approval of the secretarial lease, or January 5, 1914, appears to us as an afterthought. It is further urged, on rehearing the first time, since the release sent the Secretary recites that the company thereby "releases, relinquishes, and surrenders all right, title," etc., in and to the secretarial lease, the release was a surrender in fact of the secretarial lease, which surrender did

not become effective until the same was accepted by the Secretary and notice of the acceptance given to the company. In support of which it is urged:

"Suppose that A. has a lease for ten years upon a business building belonging to B. At the end of five years A. decides that he wishes to surrender the lease and terminate it. Unless B. is willing to accept the surrender, he can hold A. to the contract of lease. A. therefore writes B., saying: 'I hereby surrender my lease upon your business building in Oklahoma City, effective upon your acceptance hereof.' B. receives the letter, but never answers it. Is the lease terminated?"

And:

"Suppose that B., upon receiving the letter, writes thereon these words, 'I hereby accept said surrender.' but puts the letter and notation in his desk, and neither delivers nor mails it to A. nor otherwise communciates the fact of his acceptance to A. Can A. enforce as against B. a rescission of the lease?"

Since Bouvier defines a surrender to be the falling of a less estate into a greater, by deed, and is authority for the statement that the surrender immediately divests the estate of the surrenderor, and vests it in the surrenderee (citing Shepp. Touchst. 300), assuming that the release, when sent to the Secretary, was, as urged, an offer only to surrender the secretarial lease, to become "effective from the date of the approval hereof by the Secretary of the Interior," and that "approval" meant acceptance, as contended; when the Secretary received and wrote upon it, as he did, "Department of the Interior, Washington, D. C., Oct. 13, 1913, approved," and signed his name thereto, and dated it, he ipso facto accepted a surrender of the secretarial lease, and notice to the company of his acceptance was unnecessary to complete the surrender.

Loague & Fisher v. City of Memphis, 7 Lea (Tenn.) 198, was a suit for rent. The facts were that on May 1, 1870, plaintiffs leased to defendant certain premises for a station house until December 31, 1871. One of the conditions of the lease was that the city was to remain liable for rent until the premises, with the keys thereof, cleared of all persons, goods, and things, were tendered or delivered. The rent was paid under the lease and the city continued to occupy the premises as a station house until May 1, 1875, but paid the rent up to January 1, 1875, only. On May 8th plaintiff L. received a note from the chief of the city police, advising him that the premises had been vacated and were subject to his disposition. Accompanying the letter were the keys of the building, which plaintiff put in the drawers of his desk and made no reply to the letter. Some property of the city was left in the building and was not entirely removed until about the end of December, when it was done on the plaintiff L.'s request. There was a verdict for plaintiffs for rent up to May 8th, and they appealed. The court charged the jury that if the plaintiff accepted the tender of the premises as owner, intending to terminate the lease, they should find for the defendant, but otherwise for the plaintiffs, and the burden of proof was on the defendant to show that the plaintiffs did accept the possession of the premises with the intent to terminate the lease. It was not denied that there was evidence to sustain the verdict. In an opinion by Cooper, J., the court held the charge correct and affirmed the judgment.

If, in that case, it can be held that an acceptance of the surrender of a lease is proved by the receipt of the keys by the lessor, accompanied by a letter advising him that the premises had been vacated, which he put in his desk and never answered to notify the lessee whether his surrender was accepted or not, so in this case we hold that, when the Secretary received from the company its so-called offer to surrender the secretarial lease and thereupon wrote his acceptance thereof, as stated, although he may have put it in his desk, and never at any time gave notice of his acceptance to the lessee, the term of the secretarial lease thereby ipso facto closed, and the term of the commercial lease began to run. It is only where the lessor declines to accept the surrender that he must notify the lessee. And then he must notify him of such intention, and that the lessor will hold the demised premises for the remainder of the term for the use and benefit of the lessee. No case holds that the lessor, to complete a surrender, must notify the lessee of his acceptance thereof. In American Bonding Co. v. Pueblo Inv. Co., 150 Fed. 17, 80 C. C. A. 97, 9 L. R. A. (N. S.) 557, 10 Ann. Cas. 357, the court, through Sanborn, J., said:

"The surrender of leased premises by the tenants during the term of the lease and the acceptance of the property by the landlord, without a notice that the latter takes it and will hold and use it during the remainder of the term for the use and benefit of the tenants exclusively, closes the term of the lease, and destroys all rights conditioned upon its subsequent continuance. Prout v. Roby, 15 Wall. 471, 476, 21 L. Ed. 58; Watson v. Merrill, 136 Fed. 359, 362, 69 C. C. A. 185, 69 L. R. A. 719."

It would be indeed strange that a lessee of an oil and gas lease, containing a clause giving him a right to surrender the lease at any time, could not, by written surrender mailed to his lessor, safely quit possession without waiting for notice from him of the acceptance of his surrender. We repeat, it is only where the lessor refuses to accept the surrender that he must notify the lessee, and not where he accepts, as here.

Higgins v. Street, 19 Okla. 45, 92 Pac. 153, 13 L. R. A. (N. S.) 398, 14 Ann. Cas. 1086, cited by counsel for the company, fails to support their contention, but rather the contrary. That was a suit by Street against Higgins for the rent of a certain leased hotel. Higgins sublet the hotel to Mrs. T., with Street's consent; he, at the same time, refusing to accept Mrs. T. as his tenant or to release Higgins from the payment of the rent. Accordingly, although she paid it, Street receipted Higgins therefor. Mrs. T. vacated the hotel before the lease expired, whereupon, after notifying Higgins that he would hold him for the rent, Street took possession of and leased the hotel on account of Higgins for a less sum than he, by the terms of the lease, had agreed to pay, and sued Higgins for the difference. One of the contentions of Higgins was that the lease was surrendered at the time Street consented to the subletting to Mrs. T., but the court held not so, and stated the general rule to be that it is only where the lessor refuses to accept a surrender that notice thereof is necessary to enable him to sublet the premises for the unexpired term for the benefit of the lessee to reduce his damages. Clearly implying that, if upon a surrender no such notice is given, the term closes. See, also, Nat. Ex. Bank v. Hahn, 33 Okla. 516, 126 Pac. 554.

OWEN and BRETT, JJ., concur. KANE and MILEY, JJ., dissent, RAINEY, J., not participating. All the other Justices concur, but express no opinion on whether the act of the Secretary was a judicial or a ministerial act.