## HUD OIL & REFINING CO. v. SMITH et al.

No. 25963.   Jan. 26, 1937.

Rehearing Denied March 16, 1937.

William J. Crowe and Twyford & Smith, for plaintiff in error.

Looper & Sturdevant and Fred Davis, for defendants in error Alice Fern Whelan and Sarah Catherine Warren.

L. E. Smith, pro se.

BAYLESS, V. C. J. L. E. Smith instituted an action in the superior court of Seminole county, Okla., against Hud Oil & Refining Company, a corporation, and others, which action eventually resolved into a controversy between Hud Company and Whelan et al. on one issue only. The trial court resolved the question in favor of Whelan et al., and Hud Company appeals.

The controversy relates to an undivided 3/16 interest in an oil and gas lease. The issue is whether the defendants in error own this 3/16 interest free of the cost of drilling the wells proposed to be drilled thereon, one of which is already drilled, or shall bear their proportionate part of such cost. In other words, as expressed by their opponents, do they get "a free ride."

This issue must be determined by construing certain contracts and conveyances, and the conduct of the parties in relation thereto. Testimony was given in addition to the evidence of these writings, but in our opinion it is of little probative value on this point. The history of the matter is substantially as related hereafter.

A. D. Hudspeth was the owner of the lease involved. Allowing for the ⅛ royalty to be paid thereunder, Hudspeth was entitled to receive 7/8 of the oil or gas produced.

April 8, 1932, he made a written contract with the Bee Oil & Gas Company, a corporation, by which it was agreed that Bee Company should drill, at its own expense, a well on this lease to the Calvin sand. We quote material portions of the contract:

"For and in consideration of *** performance *** party of the first part (Hudspeth) agrees *** to make and execute a valid assignment to 7/16 interest in and to the oil and gas produced on the above-described land.

"When this well shall become a producer of oil and/or gas then all equipment incident to the operation and production of said oil and/or gas well thereon shall become the property of both parties herein, equally owned, exclusive of the machinery, tools and equipment used in drilling said oil and gas well."

Other considerations and obligations are included, but are not material to the issue, except it was recited that one additional well should be drilled under the contract if the first well was a producer.

May 2, 1932, Bee Company, entered into a contract, in writing, with W. E. Creighton, whereby it employed him to supervise the drilling operations on the lease and "to furnish all necessary rotary and cable drilling equipment of the first well to be drilled," for the following considerations:

"In consideration of said services and the use of said drilling equipment, as above set out, said second party promises and agrees to convey or cause to be conveyed by good and sufficient assignment to said first party, immediately upon the completion of said first well, as above set out, three-sixteenths (3/16) of seven-eighths (7/8) interest in and to the entire undivided forty (40) acre lease as hereinabove described."

The contract also provided:

"It is specifically understood and agreed by and between the parties that said first party shall act only in the capacity of an employee of second party and not as a subcontractor and said second party shall furnish all necessary fuel, water, and labor, in the matter of drilling each of said four (4) wells, and

"Said second party shall pay and stand the expense of moving, hauling or trucking all drilling machinery or other equipment which may be used on said lease, and said second party shall pay all supply bills, provide workmen's compensation insurance for all workmen and hold first party free from all claims for damages of whatsoever kind, including damages which may be sustained by defective machinery or otherwise, and second party shall pay all expenses of drilling for oil and/or gas on said lease, and deliver or cause to be delivered immediately to first party, in the tanks on said lease, three-sixteenths (3/16) of seven-eighths (7/8) of all oil and/or gas produced on said lease. Provided, however, that if oil and/or gas is discovered said first party's interest and ownership therein shall bear its pro-rata share of the cost of lifting and delivering same to pipe line.

"Second party shall not acquire any interest or title, by virtue of this agreement in or to any drilling equipment or other property belonging to first party."

The contract also recited that one and possibly three additional wells were contemplated and the provisions of the contract should apply to them.

Bee Company then sold 2/16 of the 7/16 it received to Morgan. It stood then in the position of having sold 2/16 of the 7/16, and of being obligated to convey 3/16 to Creighton, leaving it only 2/16. Creighton fulfilled his contract and became entitled to receive his 3/16. However, Bee Company

defaulted in the full performance under its contract with Hudspeth in that, although it managed to get one well drilled, it had not discharged the expense of drilling it and the lease was encumbered by mechanics' liens therefor. On June 17, 1932, Bee Company assigned its interest in said lease to Hud Company (which apparently had succeeded to Hudspeth's interest or stood in his place), said assignment reading in part as follows:

"Said assignee The Hud Oil & Refining Company does not assume and does not agree to pay any liens existing or hereafter filed against any part of said leasehold interest."

August 10, 1932, Hud Company executed an assignment to W. E. Creighton, reading:

"Whereas, Hud Oil & Refining Co., a corporation, is the lawful owner of at least an undivided seven-sixteenths (7/16) interest in the following described oil and gas lease, * * *

"Now, therefore, for and in consideration of one ($1.00) dollar and other good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, the present owner of said undivided seven-sixteenths (7/16) interest in and to said lease and leases and all rights thereunder or incident thereto, does hereby bargain, sell, transfer, assign and convey unto W. E. Creighton an undivided three-sixteenths (3/16) interest in and to said entire lease and leases, together with a like interest in and to all personal property used or to be obtained in connection therewith to the said W. E. Creighton and his heirs, successors, and assigns, subject to all liens created by the drilling of said first well, and equipping same.

"For the same considerations the undersigned for itself and its successors and representatives does covenant with the said assignee, his heirs, successors, or assigns, that it is the lawful owner of said seven-sixteenths (7/16) undivided interest in the said lease and leases and rights and interests thereunder and of the personal property thereon or used in connection therewith; that the undersigned has good right and authority to sell and convey the same, and that all rentals or royalties due and payable thereunder have been duly paid.

"This assignment is executed and delivered as provided in a certain contract between said W. E. Creighton and Bee Oil and Gas Company, dated May 2, 1932, and recorded on the 13th day of May 1932, in _____ Book Number 431 at page 360, 361, 362, 363, on the records of Seminole county, Oklahoma, which said contract is hereby ratified, acknowledged and in all things approved by the undersigned."

This 3/16 interest is now owned by the defendants in error.

The trial court appointed a receiver, operated the lease, and in adjudging the apportionment of the interests owned and the expenses and income, held that defendants in error owned (1) 3/16 of the lease, and (2) 3/16 of the oil produced free of the cost of drilling the well, but charged with 3/16 of the cost of operating the well, and (3) 3/16 of the equipment on the lease charged with its share of the cost of drilling the well.

The main purpose of Hudspeth's contract with Bee Company was to get a well drilled at Bee Company's expense, so that he and Bee Company would own clear, in so far as he was concerned, 7/16 each of the lease, and they should bear the production costs equally. Hudspeth did not want his 7/16 charged with any of the expense to be incurred by Bee Company. This is clear. In this and the following discussion we are considering Hudspeth and Hud Company as synonymous.

The contract between Bee Company and Creighton had at least three purposes: 1. Creighton was to perform an essential part of Bee's obligation in relation to the lease. 2. Creighton was to receive 3/16 of the 7/8 of the entire lease, as expressed at one place (no exemption from expense mentioned), and, as expressed in another place, 3/16 of 7/8 of the oil or gas in the pipe line, burdened only by its share of the cost of lifting and delivering. We construe this to mean: (1) That Creighton was to get 3/16 interest in the lease, (2) that he should pay no part of drilling expense except the work and equipment he contracted to furnish—that all else should be born by Bee Company from its 4/16; and (3) that he should pay 3/16 of the cost of lifting the oil from the sand and delivering it into the pipe line. Hudspeth was not a party to this, nor were his interests bound thereby, unless he afterwards assumed a different position. In this and the following discussion we treat Creighton and defendants in error as synonymous.

When Bee Company assigned to Hud Company the contracting parties knew Bee was returning what it then had of the 7/16 Hudspeth had conveyed to it. This was not definitely named, but was described generally as "all of the right, title and interest" it owned. No mention was made of the 2/16 sold Morgan, or the 3/16 due to be assigned to Creighton. From this assignment we gather two things: (1) Hud Company reacquired what was left of what it had conveyed; and (2) whatever its purpose was in so doing, it did not assume or agree to pay the outstanding liens.

At this point it is equally clear (1) that although Creighton was to receive his 3/16 clear, as between himself and Bee Company, he had not actually received his assignment, and when he actually did get his assignment it would, as between him and the lien claimants, be subject to the lien claims; (2) that Hud Company knew of the sale to Morgan, and of Creighton's rights, which in themselves were not inimical to Hud Company's position—in other words, Hud Company had not the right to prevent Bee Company selling portions or all of its interest; and (3) that Hud Company's 7/16, plus what it received back from Bee Company, was subject to the liens, despite its intention and efforts otherwise, although Hud Company was not under a personal liability for the debts.

Therefore, on August 10, 1932, when Hud Company prepared to assign the 3/16 to Creighton, the entire interest owned by Hud Company was encumbered by these liens, for which Hud Company was not liable on the debts represented; and Creighton was entitled to receive his 3/16 free thereof as between himself and Bee Company. This being the situation, the provisions of the assignment must be construed in light thereof.

The rules of law relating to the construction of contracts are too well known to need recitation. No cases are cited which will aid us in construing these writings—in other words, our task is to ascertain the rights of the parties in the present situation.

Let us analyze the assignment from Hud Company to Creighton. (1) It recites that Hud Company is the owner of "at least 7/16 interest" in the lease. We do not know whether this recitation was merely preliminary, or whether it was designed to identify the source from which Creighton's 3/16 was to come; that is, from the 7/16 it retained when it contracted with Bee Company the first time. (2) Hud Company conveys 3/16 interest in the entire lease, and qualifies the estate conveyed by subjecting it to the liens created in the drilling of the first well. (3) Hud Company covenants that it is the owner of the 7/16 interest, without qualification, and that it has good and lawful authority to convey. (4) It recites that the assignment is "executed and delivered" as provided in the contract between Bee Company and Creighton, and "which contract is hereby ratified, acknowl-

edged and in all things approved by the undersigned (Hud Company)."

By giving provisions 2, 3, and 4 their literal meaning, as above summarized, the conclusion that they conflict is inescapable. The qualifying clause in 2, "subject to the liens," doubtless meant "subordinate" thereto or "burdened" thereby. Yet in the very next paragraph the covenant is of ownership unqualified with the right to convey. It may be argued that, since all parties knew the liens existed, and that the language of the previous paragraph subjected the 3/16 interest to the liens, the covenant cannot be said to be unqualified. Parties may contract with knowledge of infirmities of title, and yet not recognize them in the contract or exclude them from the covenants of the vendor. In this aspect, the assignment may be construed to be harmonious. In view of the fact that the liens were fastened upon the interests by law, and the further fact that Hud Company had refused to assume any legal liability for the payment thereof, paragraphs 2 and 3 are harmonious. The assigned interest had to be subject to the liens as a matter of law, and yet Hud Company would not care to covenant against them. But, nevertheless, it might so convey as to give Creighton to know and understand that liens existed and Hud Company would not remove them or covenant against them, and yet also give Creighton to understand that if the property should be freed of the lien in some manner short of destroying Creighton's interest, such interest should have a free ride. This actually worked out by the payment of the claims from the production of the lease, and the interests are now free of the liens, and the court adjusted the equities between the parties in conformity with the contract between Bee Company and Creighton, which was ratified, acknowledged, and approved by Hud Company.

As to the 4th paragraph, we can arrive at no conclusion other than that Hud Company was attempting to fulfill Bee Company's contract with Creighton. That contract certainly provided for a "free ride." Further, we think the language "ratified, acknowledged, and in all things approved" means a recognition of a claim (1 C. J. 738); a consent to some act or thing done by another (4 C. J. 1462, and Melton v. Cherokee Oil & Gas Co., 67 Okla. 247, 170 P. 691); or imports confirmation of acts already done (52 C. J. 1147, and notes). To us such language evidences a clear contention on the part of Hud Company to modify its position because of the general situation. it knew existed. Since the earnings or income from the lease paid the liens, and all the parties yet owned their interest, Hud Company modified its position and gave assent to Bee Company's contractual obligation to Creighton.

Looking at the contract as an entirety, after an analysis of its component parts, in the light of the parties' positions, we are of the opinion that the trial court correctly held that Creighton's 3/16 interest (except the equipment) was not to be charged with any expense of the drilling of the first well (other than the things Creighton agreed to furnish), and we so construe the contracts and assignments.

Judgment affirmed.

OSBORN, C. J., and BUSBY, GIBSON, and HURST, JJ., concur.